David S. Preminger (DP 1057)
Rosen Preminger & Bloom LLP
708 Third Avenue, Suite 1600
New York, NY 10017
(212) 682-1900

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
VALERIE A. SHORE,

                Plaintiff,

      v.                                        No. 04 CV 4152 (KMK)

PAINEWEBBER LONG TERM DISABILITY      ECF Document
PLAN, *et al.*

                Defendants.
-------------------------------------------------------------x

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT

      Pursuant to Local Rule 56.1(a), plaintiff Valerie A. Shore ("plaintiff") sets

forth the following as material statements of fact as to which there is no genuine

issue to be tried:

      1.     In 1997, plaintiff began working for Correspondent Services

Corporation, a subsidiary of PaineWebber Inc. ("PaineWebber") with the title of

Ethics Officer/Director of Continuing Education, and an annual salary of $75,000

and a guaranteed minimum annual bonus of $50,000.  See Complaint, Ex. 1[1];

Answer, Ex. 2, at ¶ 10.

      2.     As an employee of PaineWebber, Plaintiff was a participant in the

PaineWebber Long-Term Disability Plan (the "Plan"), which was insured under a

---

[1] References to "Ex. _" are to the exhibits attached to the declaration of David S. Preminger.

group insurance policy (the "Policy") issued by Reliance Standard Life Insurance Company ("Reliance").  <u>See</u> Complaint; Answer, at ¶ 17.[2]

3.      In her position as Ethics Officer/Director of Continuing Education, plaintiff created ethics and continuing education programs for the firms that cleared their business through PaineWebber, was responsible for assisting these firms with audits by the Securities Exchange Commission ("SEC") or the National Association of Securities Dealers ("NASD"), hosted a weekly telecast serving these clients, and was required to be up to date on applicable rules and regulations, and new facets and products of the finance industry.  [AR0091][3]; <u>see also</u> Complaint; Answer, at ¶ 11.

4.      Plaintiff regularly attended seminars, Securities Industry Association, SEC and NASD events, and maintained relationships with law firms specializing in securities and employment law.  [AR0091]; <u>see</u> <u>also</u> Complaint; Answer, at ¶ 11.

5.      Plaintiff also managed a national marketing support center for approximately thirty different investment products and produced national advertising, public relations, marketing campaigns and promotional events

---

[2] After plaintiff ceased working due to her disability, UBS Financial Services Inc. acquired PaineWebber, Inc.  Defendants assert that the correct name of the long term disability plan is now the "UBS Financial Services Inc. Long Term Disability Plan," <u>see</u> Answer, at ¶ 6, Ex. 2.  Thus, UBS Financial Services has apparently assumed administrative responsibility for the Plan. However, for purposes of this motion, plaintiff refers to the Plan in effect at the time she became disabled, the terms of which govern plaintiff's claims for benefits herein.

[3] Citations to "[AR]" are to the administrative record produced by defendants, which is reproduced in its entirety as Ex. 5.

created to attract PaineWebber's clearing clients.  [AR0091]; see also Complaint; Answer, at ¶ 11.

6.      In addition, plaintiff was also directly responsible for coordinating the printing of sensitive materials, which involved lifting, carrying and unpacking heavy boxes containing printed material, editing that material, shredding confidential material, and working closely with the printing companies.  [AR0091]

7.      Plaintiff's occupation was not sedentary.  Id.

8.      Plaintiff's daily work activities included frequent computer work, making telephone calls for six to ten hours a day, and attending frequent seminars conferences, meetings and interviews within New York and out of state. Id.; see also Complaint; Answer, at ¶ 11.

9.      She was also responsible for hosting similar conferences, which required her to visit various sites to determine where to hold the conferences, meet with potential speakers, and coordinate all aspects of the conferences and attend the conferences.  [AR0091]; see also Complaint; Answer, at ¶ 11.

10.     Plaintiff also hosted luncheons and dinners in New York and out of state.  [AR0091]; see also Complaint; Answer, at ¶ 11.

11.     Her daily working hours were, at a minimum, from 8:00 am to 6:00 pm.  She also frequently worked from home at other than normal business hours, principally by computer and telephone.  [AR0091]; see also Complaint; Answer, at ¶ 13.

12.     Plaintiff traveled by subway, bus, ferry or taxi to get to work and to frequent meetings with clients.  [AR0091]  She also traveled frequently to

PaineWebber's offices in New Jersey and San Francisco, and regularly drove long distances to visit regional clients. Id.; see also Complaint; Answer, at ¶ 11. When attending conferences or meetings that were too far to drive to, plaintiff traveled by airplane. Id.

13.     On or about January 15, 1999, plaintiff injured her back at work while lifting boxes that contained sensitive information to be shredded. [AR0273] It was a three-day weekend and PaineWebber was moving offices. The shredding needed to be completed before plaintiff left the office.

14.     Plaintiff has been unable to return to work since January 19, 1999 because of persistent lower back pain, numbness in her feet and pelvis and urinary tract problems resulting from her back injury. [AR0273, AR0043-AR0189] Plaintiff has been under medical care for these problems since her injury and has been diagnosed with a herniated disc, degenerative disc disease, lumbar radiculopathy and osteoarthritis. [AR0099, AR0104] Plaintiff also has now been diagnosed with osteopenia, a precursor to osteoporosis. See Shore Decl. ¶ 28.

15.     An MRI of plaintiff's spine performed on February 9, 1999 showed that plaintiff has "a small left-sided prolapse of the L4-L5 intervertebral disc extending into the left lateral recess. . . . At L5-S1 there is a minimal posterior bulge on the left side." [AR0501]

16.     A subsequent MRI conducted on July 26, 2000 confirmed a "tiny mid left paracentral disc herniation L5-S1, . . . mild degenerative changes, . . . [and] a small left sided, left lateral disc herniation at L4-L5." [AR0104]

17.     An electromyograph (EMG) conducted April 8, 1999 showed that plaintiff has an absent right peroneal nerve wave and mild neuropathic dysfunction in the muscles, supporting the conclusion that plaintiff has mild right-sided dysfunction at the L5 disc.  [AR0453-55]

18.     Because of the complex nature of plaintiff's injuries, she has been treated by multiple physicians, including an orthopedic surgeon (Dr. Sheldon Lichtblau) [AR0457-59], two spinal surgeons (Dr. Charles Gatto [AR448-56] and Dr. William Kennedy Main [AR 0514-17]), a rheumatologist (Dr. Swerdlow) [A0092-113], and a urologist (Dr. Jonathan Vapnek) [AR0157-68], and has also received extensive physical therapy [AR0171].  See also [AR0369] (letter from plaintiff to Reliance explaining her relationships with these doctors).  In addition, plaintiff was examined by several doctors in connection with her worker's compensation claim (Dr. Fred Hochberg [AR0137-39] and Dr. Samir Dutta [AR0114-15]).

19.     According to Dr. Frederick Swerdlow, one of plaintiff's treating physicians, the severe lower back and pelvic area pain and numbness experienced by plaintiff "are characteristic of lumbar radiculopathy and the discogenic problem previously documented on the MRI test."  [AR0099]

20.     Plaintiff's painful symptoms are exacerbated if she sits or stands for more than thirty or forty minutes at a time, and she needs to change her position frequently.  [AR0402-03, AR0181-84, AR0099, AR0111, AR0113, AR0114-15, AR0178]

21.     Since her injury, plaintiff has been able to walk for only short distances, and she spends much of the day lying down, which relieves the pain somewhat.  [AR0183-84]

22.     In order to manage her pain, plaintiff takes prescription pain medication, anti-inflammatories and muscle relaxants.  Her medications include Celebrex, Naprosyn, Valium, Flexeril, Ambien, Vicodin, and Hydrocodone. [AR0092-93, AR0114, AR0169-70, AR0424-26, AR0439, AR0505]

23.     Many of these medications cause drowsiness and interfere with plaintiff's ability to concentrate.  [AR0099, AR0181, AR0273]

24.     Plaintiff applied to Reliance for LTD benefits in June 1999. [AR0272-74]

25.     Under the Plan, plaintiff is entitled to long term disability ("LTD") benefits payable through age sixty-five, commencing after a 180 day elimination period.  See Ex. 4, at p. 1.0.

26.     The monthly LTD benefit is 60% of the Plan participant's average monthly salary from the three prior years, up to a maximum benefit of $12,500 per month.  See id.

27.     The Policy governing plaintiff's benefits defines "Totally Disabled" and "Total Disability" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1)     during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

(a)     "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

(b)     "Residual Disability' means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability' and

(3)     after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

See Ex. 4, at p. 2.1.

28.     In her initial claim, plaintiff informed Reliance that she was unable to work because she suffered from extreme pain when sitting, standing and walking, nerve pain in her right leg and feet, numbness in her foot, buttock and pelvic areas, urinary tract problems, and was drowsy and experienced unclear thinking while on pain medication. [AR0273]

29.     Plaintiff's claim was granted by Reliance on August 18, 1999, and LTD benefits were paid at a rate of $4,239.05 per month. [AR0214-15]

30.     After approving plaintiff's claim, Reliance requested, and plaintiff provided, additional information from her treating physicians. The information provided to Reliance included:

a.      An MRI performed February 9, 1999 finding that plaintiff has "a small left-sided prolapse of the L4-L5 intervertebral disc extending into the left lateral recess. . . . At L5-S1 there is a minimal posterior bulge on the left side." [AR0501]

b.      A certificate of disability form completed by Dr. Charles Gatto dated March 26, 1999, concluding that plaintiff was not capable of doing her usual work and that plaintiff was incapable of lifting, squatting, bending or climbing and would need frequent breaks for changes of position. [AR0484-85]

c.      EMG test results dated April 8, 1999 showing an absent right peroneal nerve wave and mild neuropathic dysfunction in the muscles, supporting the conclusion that plaintiff had mild right-sided dysfunction at the L5 level. [AR0404]

d.      An April 22, 1999 report from Dr. Charles Gatto indicating that plaintiff had been to physical therapy without improvement, and that her symptoms of pain and numbness were exacerbated by sitting for more than thirty minutes. [AR0402] Dr. Gatto observed that plaintiff's MRI shows "some degenerative disc disease with some annular bulging at the L4-5 level with some foraminal stenosis from the disc annulus on the left side at that level to a mild to moderate degree. . . . Her EMG is consistent with mildly abnormal L5 right-sided dysfunction." [AR0402]

e.      An April 29, 1999 report from Dr. William Kennedy Main noting that plaintiff had been initially treated with bed rest for two months,

8

and that her "complaints include lower back pain, right leg pain and numbness in the pelvis, buttocks, feet and in the right leg. She says it hurts to stand, sit or to lay down and she has difficulty sleeping at night. Her treatment up until now has included physical therapy and acupuncture. Current medications include . . . Naprosyn, Vicoden and Flexeril." [AR0439]  Dr. Main stated that the "MRI scan of the lumbar spine reveals a disc herniation at L4-L5, where there is a loss of disc space height and loss of signal within the disc itself. The L5-S1 disc also appears to have some desiccation." [AR0439]   He concluded that "Valerie has primarily mechanical back pain related to a disc injury dating back to her work related incident on January 15, 1999" and recommended a prolonged course of physical therapy before considering more invasive treatment.  [AR0439-40]

       f.       Physical therapy notes dated May 5, 1999 documenting that plaintiff was taking Naproxen, Flexeril and Hydrocodon for pain, and that plaintiff suffered pain from sitting approximately five minutes into the treatment session.  [AR0424-26]

       g.       Physical therapy notes dated May 10, 1999 documenting that plaintiff's pelvis became numb approximately four minutes into therapy when seated.  [AR0430]

       h.       A "Physician's Statement" completed by Dr. Main for Reliance in July 1999, stating that plaintiff suffers from a lumbar herniated disc at the L4-L5 level, with low back pain radiating down her left leg.  Dr.

Main also stated that plaintiff was currently prescribed Flexeril and Vicodin, and has "primarily mechanical back pain related to disc injury dating back to her work related incident on January 15, 1999." [AR0505-06] Dr. Main further stated that plaintiff could stand and sit for only one to three hours per day, and could not walk or drive at all. [AR0506]

       i.      An August 5, 1999 report from Dr. Fred Hochberg indicating that plaintiff "is still considered to have a moderate partial disability" and recommending that plaintiff attend additional physical therapy. [AR0478]

       j.      An August 17, 1999 report from Dr. William Main indicating that plaintiff "continues to complain of lower back pain, urinary tract problems, numbness in the pelvis, upper hip, and the feet. She has pain with standing, sitting or lying." [AR0360] Dr. Main also stated that he did not presently recommend spinal surgery, and that "[i]t is a common situation that patients have concurrent back pain, sciatica and other lower extremity symptoms in conjunction with urinary complaints, although no obvious cause can be found for the latter." [AR0360-61]

30.      On October 13, 1999, plaintiff attended a brief examination with Dr. Edward Adler, at the request of Reliance. [AR0394]

31.      In his report summarizing the examination, Dr. Adler noted tenderness in the lumbrosacral junction and that plaintiff's "lumbar spine is quite stiff and flexion and extension of the spine are limited by pain." [AR0385] He also observed that plaintiff did "not have difficulty getting on and off the

examination table, but does have difficulty taking her shoes on and off."
[AR0385]

32.    In his conclusions, Dr. Adler diagnosed plaintiff with
"[d]egenerative disc disease and mechanical low back pain," and suggested that
plaintiff could take non-steriodial medication or Tylenol for her pain.  [AR0386]

33.    On the "Physical Capacities Assessment" form completed by Dr.
Adler for Reliance, there is no indication of how many hours per day plaintiff
could walk, sit or stand.  [AR0387]  However, Dr. Adler nonetheless opined that
plaintiff "is capable of sedentary desk work" and could return to work if her
urodynamic test results were normal.  [AR0388]

34.    Reliance then requested that Consultative Review & Rehabilitation
Inc. interview plaintiff and prepare a report regarding plaintiff's potential for
vocational rehabilitation.  [AR0327-32]  The report details an October 6, 1999
interview with plaintiff, in which plaintiff indicated that she has been seen by five
different physicians since her injury, was taking Valium, Naprosyn, Advil, Pridium
and an anti-spasmodic medication, and that plaintiff "spends most of her time
lying down in her apartment and is only able to engage in even the minimal
amount of physical activity for one to two hours per day."  [AR0330]

35.    Plaintiff subsequently provided a report from Dr. Jonathan Vapnek,
dated November 2, 1999, which stated that while the urodynamic testing had
shown few abnormalities, an "elevation in urethral sphincter pressures is
commonly seen in those with back problems," and "[i]t might be instructive to
repeat the testing when the patient is symptomatic."  [AR0365]

36.    By letter dated June 19, 2000, Reliance informed plaintiff that it had concluded that she was no longer disabled.  [AR0266-68]

37.    Reliance stated, in reliance on the opinion of Dr. Adler, that because the urodynamic testing did not show any abnormalities, plaintiff was capable of performing sedentary work.  [AR0267]  Reliance did not discuss the nature of the material duties of plaintiff's occupation or the opinions of plaintiff's treating physicians that plaintiff was not capable of even sedentary work because she was unable to sit for more than one to two hours per day and required extensive pain medication.

38.    On November 20, 2000, plaintiff's former counsel appealed Reliance's termination.  [AR0043-AR0189]

39.    The information submitted in appeal included the following:

a.    A summary of the material duties of plaintiff's occupation, which showed that her occupation was not sedentary as it required frequent travel, hosting and organizing seminars and conferences, conducting tours, and lifting and carrying heavy boxes in connection with coordinating the printing of confidential material.  [AR0045-46, AR0091]

b.    A November 14, 2000 report from Dr. Frederick Swerdlow who opined that plaintiff was unable to "work in any capacity because of difficulty sitting even for short periods of time and difficulty walking and standing. . . .  Her limitation of ability to sit in particular makes working even at a sedentary job impossible."  [AR0093]  Dr. Swerdlow also

confirmed that plaintiff was taking prescription pain medication and muscle

relaxants including Celebrex, Flexeril, Valium and Ambien.  [AR0092]

       c.     A July 24, 2000 opinion by Dr. Swerdlow that plaintiff:

> continues to experience pain in the lower back with
> paresthesias especially severe in the lower back and pelvis as
> well as the lower extremities. . . .  These clinical problems are
> characteristic of lumbar radiculopathy and the discogenic
> problem previously documented on the MRI test.  Her
> symptoms are worsened by sitting in particular or standing for
> prolonged periods of time and some problems are typically
> experienced within the context of her established diagnosis of
> discogenic disease.  She continues to require treatment with
> anti-inflammatory medication as well as muscle relaxants
> along with analgesics but unfortunately the use of these
> medications interferes with her ability to concentrate.
> [AR0099].

       d.     Additional reports from Dr. Swerdlow: a March 31, 2000

report (stating that plaintiff is under his care for the treatment of "lumbar

radiculopathy in the setting of degenerative disc disease," confirming that

plaintiff "remains disabled as a consequence of this injury and continues to

require ongoing care . . . ") [AR0098]; examination notes dated March 31,

2000 (indicating that he recommended a trial of Ultram, an opiate pain

medication) [AR00102]; June 15, 2000 Physical Capacities Evaluation

form (stating that plaintiff was limited in standing and/or walking to less

than two hours per day, and could sit for less than six hours per day (the

highest degree of impairment that can be indicated on the form) [AR0111];

April 10, 2000 form (same limitations) [AR0113].

       e.     An April 7, 2000 "Physical Capacities Evaluation" form

completed by plaintiff's physical therapist indicating that plaintiff could

carry up to five pounds, frequently carry only one to two pounds, stand and walk for less than two hours per day and sit for less than six hours per day, and that plaintiff was limited in her ability to push or pull and had limited strength in her lower legs, and a September 28, 1999 report from the physical therapist stating that plaintiff could carry three pounds, stand and walk for less than two hours per day, and sit for less than six hours per day.  [AR0374, AR0153]

      f.      An opinion from Dr. Samir Dutta, who stated that "[c]laimant takes Advil for pain and Hydrocodone . . . .  She cannot drive.  She lives on her own.  She can sit for 45 minutes, stand for 45 minutes, walk for five to six blocks, and can carry about five lbs. maximum.  She spends her time at home, doing some light household chores."  Dr. Dutta further noted that plaintiff's "[s]pine shows moderate paraspinal muscle spasm."  His diagnosis was that plaintiff suffered from a herniated disc at L4-5 as well as a bulging disc L5-S1 with right lumbar root radiculopathy.  He concluded that "[c]laimant's conditions are chronic in nature, and not likely to improve completely. . . .  Claimant can sit for one to two hours, stand for one to two hours, walk for eight to ten blocks, and can carry about 10-15 lbs."  [AR0114-15]

      g.      A decision by the Social Security Administration finding that plaintiff was unable to work.  [AR172-180]  The Social Security administrative law judge expressly found that plaintiff's "own subjective allegations" regarding her pain and impairment were "credible."  The judge

also concluded that plaintiff was "able to lift or carry up to only 10 pounds, and to sit for up to only two hours and stand or walk for only two hours in an eight-hour workday."  [AR0178]

h.    A list of medication prepared in conjunction with plaintiff's Social Security application, indicating that plaintiff was taking extensive prescription medication for her pain, including Naproxen, Flexeril, Ambien, Hydrocodone, Sulindac, Celebrex and Vicodin.  [AR0169-70]

i.    An affidavit from plaintiff in which she detailed the nature of her back pain and numbness in her extremities.  [AR0181-84] Specifically, plaintiff stated that she takes medication, including Celebrex, Valium and other pain relievers, but tries not to do so with frequency even when she is in great pain because of her concern about addiction. [AR0181]  Plaintiff also stated in her affidavit that she is unable to sit for more than approximately thirty-five minutes without experiencing severe pain and numbness, and that she spends most of the day lying down. [AR0183-84]

40.    To supplement the record, by letter dated January 22, 2001, plaintiff's former counsel provided Reliance with a decision from the New York State Workers Compensation Board concluding that plaintiff was permanently partially disabled.  [AR0023-25]

41.    On January 25, 2001, a claim review of plaintiff's file was conducted by Dr. William Scott Hauptman.  [AR0012-0019]

42.    Dr. Hauptman claims to be board certified in internal medicine and gastroenterology; neither specialty is in any way relevant to plaintiff's claim of disabling back pain.  [AR0012]

43.    Dr. Hauptman did not examine plaintiff or contact her, see Shore Decl. ¶ 15, nor does his report or the claim file indicate that he contacted any of plaintiff's treating physicians.

44.    Dr. Hauptman appears to have spent fewer than five hours reviewing plaintiff's medical information and preparing his report to Reliance. [AR0020]

45.    Dr. Hauptman's conclusion that plaintiff "can function at the sedentary level with the proviso that she can have breaks as necessary to stand up and move around," was purported to be based upon the "minimal findings of the objective studies (MRI and EMGs) that this patient has had."  [AR0018-19] He also cited the fact that plaintiff indicated she took Advil for pain in February 2000 when she went to see Dr. Swerdlow, noting that "[p]atients with severe lower back pain that would disable them from a sedentary occupation routinely require significant pain medication for control of their symptoms."  [AR0019]

46.    As plaintiff has explained, the reference to Advil was taken out of context by Dr. Hauptman.  See Shore Decl. ¶¶ 19-23.

47.    Dr. Swerdlow's reference to Advil was related to plaintiff's complaints of wrist pain, for which plaintiff was also referred to him, and which plaintiff had been able to control with Advil.    See id. ¶ 20-21; [AR0106].

48.     At the time plaintiff first saw Dr. Swerdlow, she was regularly taking Celebrex, Flexeril, Vicodin and Hydrocodone to manage her pain.  See Shore Decl. ¶ 23; [AR0169].  Because that treatment was inadequate, Dr. Swerdlow prescribed a trial of Ultram, an opiate pain medication.   See id. ¶ 24; [AR0102]

49.     While Dr. Hauptman's report did note that Dr. Swerdlow prescribed Ultram to plaintiff [AR0016], that fact was ignored by Dr. Hauptman in his conclusion.  Dr. Hauptman's conclusion also ignored the fact that plaintiff was prescribed Celebrex (an anti-inflammatory), Flexeril (a muscle relaxant), Ambien (a sedative) and Valium (a muscle relaxant), and had been prescribed extensive pain medication including Hydrocodone and Vicodin since at least April 1999. [AR0016, AR0169-70, AR0439, AR0605, AR0424].

50.     Finally, Dr. Hauptman stated that plaintiff was able to get on and off the examining table without assistance and that physical therapy notes indicated that plaintiff was able to walk and go to the gym.  [AR0019]

51.     The physical therapy notes cited by Dr. Hauptman are ambiguous at best: Plaintiff's initial physical therapy consultation notes state "Activities: gym, walk," but do not indicate to what degree plaintiff was capable of performing those activities.  [AR0424]

52.     Plaintiff's physical therapist was located at a gym, where plaintiff did routine physical therapy.  She was unable to do any aerobic activity or weight lifting of any kind.  See Shore Decl. ¶ 18.

53.     As set forth in plaintiff's November 2000 affidavit, plaintiff's attempted to walk the nine blocks between her apartment and her physical

therapist's gym.  [AR0182]  However, plaintiff usually took a taxi because of her

back and leg pain.  [AR0182]; see also Shore Decl. ¶ 17.  When plaintiff could

not find a taxi, she took the bus, although climbing the stairs and being jostled

when she could not get a seat caused her further pain.

54.    By letter dated February 16, 2001, Reliance denied plaintiff's

appeal.  [AR0005-0011]

55.    In its denial, Reliance stated that "[w]hile we understand that you

claim Ms. Shore's *job* requires a great deal of physical exertion, her *occupation* is

classified as sedentary duty by the United States Department of Labor's

Dictionary of Occupational Titles ("DOT") (emphasis in original).  [AR0006]

56.    Reliance then concluded, relying heavily on the claim review by Dr.

Hauptman, that plaintiff was capable of sedentary work:

> While Ms. Shore may continue to have some complaints of pain, it
> appears this pain is controlled with medication which is taken on an as
> needed basis.  The records of Ms. Shore's physicians, specifically Dr.
> Hochberg and Dr. Adler[4], note that Ms. Shore was able to mount and
> dismount the examination table without any assistance.  As the medical
> records in the claim file do not document a condition so severe [that] it
> would render her unable to perform the material duties of her occupation,
> Ms. Shore no longer meets the applicable definition of "Total Disability," as
> previously quoted, and no further benefits are payable in connection with
> this claim.

[AR0010]

57.    In concluding that plaintiff's regular occupation was sedentary,

Reliance ignored the description provided by plaintiff and instead cited a

---

[4] Actually, neither Dr. Adler nor Dr. Hochberg are plaintiff's treating
physicians.  Dr. Adler was the independent medical reviewer commissioned by
Reliance to examine plaintiff on August 13, 1999.  [AR0394]  Plaintiff was
referred to Dr. Hochberg for examination in conjunction with her application for
worker's compensation benefits.  [AR0137-39]

Department of Labor occupational description applicable to "Educational

Program Directors." [AR0006]

58.    That occupational description indicates that the position described

is sedentary, and involves "lifting, carrying, pushing, pulling 10 Lbs. occasionally.

Mostly sitting, may involve standing or walking for brief periods of time."

[AR0342]

59.    This occupational description does not accurately describe the

material duties of plaintiff's occupation at PaineWebber.

60.    As Reliance had been informed, plaintiff was required to: travel

frequently to meet with clients across the country; plan, coordinate and attend all

day meetings and educational conferences; and coordinate the printing of

confidential material. [AR0191]

61.    These obligations were critical parts of plaintiff's occupation as

Ethics Officer/Director of Continuing Education for PaineWebber's clearing

clients.

62.    Unlike the Department of Labor occupational description, plaintiff's

duties demanded intensive walking and standing, as well as lifting and carrying

heavy boxes. See supra, ¶¶ 3-12.

63.    Notwithstanding this evidence in the record regarding plaintiff's

disability, Reliance concluded that plaintiff was not disabled from sedentary work.

[AR0010]

64.    In ultimately denying plaintiff's claim, Reliance cited only two facts:

(1) its erroneous view that plaintiff's pain is controlled with medication, and (2)

the fact that two doctors noted that plaintiff "was able to mount and dismount the examination table without any assistance."  [AR0010]

65.    Despite evidence from plaintiff's treating physician and plaintiff's own testimony that her pain medication rendered her drowsy and unable to concentrate, neither Reliance nor Dr. Hauptman discussed the impact of plaintiff's medication on her ability to work.  [AR0005-19]

66.    During her employment with PaineWebber, plaintiff was not provided with a copy of the Reliance insurance policy governing the Plan (the "Policy").  See Shore Decl. ¶ 5.

67.    The only Plan document that plaintiff received during her employment with PaineWebber was a purported summary of the terms of the Plan.  See id. ¶ 4.

68.    That summary plan description ("SPD") does not describe plaintiff's rights as a participant of the Plan, and does not include any information about filing or appealing a claim for benefits.  See Ex. 3.

69.    The SPD does not state that a participant or beneficiary must file a legal action within three years of the date proof of loss is received by Reliance. See id.

70.    Instead, the section titled "Your Rights as a Plan Participant" states that "[f]or further information about filing or appealing a claim and your rights as a Plan participant, please refer to the *Legal and Administrative Overview* booklet." Id. at p. 20.  (emphasis in original).

71.    Plaintiff has never been provided with this booklet.   <u>See</u> Shore Decl. ¶ 5.

72.    Plaintiff worked in a satellite office of PaineWebber in New York City, while PaineWebber's main headquarters were located in New Jersey.  <u>See</u> <u>id.</u> ¶ 6.

73.    Employees in PaineWebber's New York office where plaintiff worked frequently did not receive administrative materials that were provided to other PaineWebber employees.  <u>See</u> <u>id.</u>

74.    After plaintiff became disabled in January 1999, she reviewed the SPD in connection with her claim for long-term disability benefits.   <u>See</u> <u>id.</u> ¶ 7.

75.    After plaintiff's benefits were terminated by Reliance in June 2000, plaintiff retained counsel.  <u>See</u> <u>id.</u> ¶ 8.

76.    Plaintiff's former attorneys were provided with a Reliance insurance policy applicable to those employees earning less than $250,000 per year, with an effective date of 1986, and another Reliance insurance policy, with an effective date of 1997, which was applicable to employees earning over $250,000 per year.  (As previously stated, plaintiff made less than $250,000 per year while employed by PaineWebber.)  <u>See</u> <u>id.</u>

77.    Neither of these policies were applicable to plaintiff's claim.

78.    Plaintiff never reviewed either of these Reliance insurance policies and was unaware that either of the policies required a legal action to be brought within three years after proof of loss was received by Reliance.  <u>See</u> <u>id.</u> ¶ 9.

79.    After plaintiff's appeal was denied by Reliance, plaintiff's files were put into storage.  See id. ¶ 11.  Those files were returned to plaintiff in March 2004.  See id. ¶ 2.

80.    Plaintiff did not learn that a three year limitations period might apply to her claims for benefits until April 2004, after she contacted another attorney regarding her benefits and provided them with the files.  See id. ¶ 13.

81.    Plaintiff's current counsel was provided with the applicable policy on October 6, 2004.  See Exs. 4, 6.

82.    Plaintiff's condition has not improved since November 2000 when she last submitted medical records to Reliance.  See id. ¶ 26.

83.    Plaintiff has been unable to work since her injury.  See id. ¶ 27.

84.    Plaintiff has been informed by her doctors that there is nothing further that can be done for her condition.  See id. ¶ 28.

85.    Plaintiff remains under medical care and she continues to take prescription medication, including Celebrex, Valium, Ambien, Xanax, Celebrex, Flexeril, Darvocet and Hydrocodone to manage her pain.  See id. ¶ 32. Plaintiff's medications have not changed significantly in the past four years.

86.    Plaintiff still spends most of every day lying down because sitting for more than an hour at a time causes severe pain in plaintiff's back and legs, as well as numbness in her pelvis, which causes incontinence.  See id. ¶ 29.

87.    If plaintiff needs to sit for more than an hour at a time, she takes high doses of medication before and after, which cause extreme drowsiness. See id. ¶ 29.

88.     Plaintiff has been making an effort to walk for about thirty minutes two or three times a week because of high cholesterol and a history of heart problems.  Such walking causes her constant back pain, and she takes pain killers and muscle relaxants and lies down afterwards.  See id. ¶ 31.

89.     Since plaintiff's benefits were denied by Reliance, she has to greatly reduce her standard of living.  See id. ¶ 34.

90.     Plaintiff moved to California in September 2001 to reduce her living expenses and be closer to her family.  See id. ¶ 33.

91.     She has supported herself with Social Security Disability and worker's compensation payments, which she has supplemented with savings. See id. ¶ 34.

92.     Plaintiff remains unable to work at her occupation or any occupation as a result of the limitations imposed by her back and leg pain and the effects of pain medication.  See id. ¶ 27.


Dated:        New York, New York              Rosen Preminger & Bloom
              January 11, 2005                Attorneys for Plaintiff


                                              By:_____s/_____
                                                 David S. Preminger (DP 1057)
                                                 608 Third Avenue, Suite 1600
                                                 New York, New York 10017
                                                 (212) 682-1900