David S. Preminger (DP 1057)
Rosen Preminger & Bloom LLP
708 Third Avenue, Suite 1600
New York, NY 10017
(212) 682-1900

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

VALERIE A. SHORE,

                Plaintiff,

     v.                                                      No. 04 CV 4152 (KMK)

PAINEWEBBER LONG TERM DISABILITY            ECF Document
PLAN, *et al.*.

              Defendants.

------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF HER MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities.................................................................................. iii

I.  Preliminary Statement ....................................................................... 1

II.  Factual Background ............................................................................ 2

    A.  Plaintiff's Employment with PaineWebber, Inc. ............................ 2

    B.  The Material Duties of Plaintiff's Regular Occupation .................... 3

    C.  Plaintiff's Injury and Medical Treatment ...................................... 5

    D.  The Administrative Process .......................................................... 7

        1.  Plaintiff's initial application for LTD benefits. ......................... 7

        2.  Plaintiff provided proof of disability to Reliance. ................... 7

        3.  Reliance erroneously terminated plaintiff's benefits in June 2000. ........................................................... 10

        4.  Plaintiff's administrative appeal .......................................... 10

        5.  Reliance wrongly determined that plaintiff's occupation is sedentary and that plaintiff can perform the duties of a sedentary occupation. .................... 13

III.  Standard of Review .............................................................................. 15

IV.  The Plan .............................................................................................. 15

V.  Discussion ........................................................................................... 17

    A.  Plaintiff's claim is timely and the Policy's three year limitations period does not apply...................................................... 17

        1.  The SPD fails to comply with ERISA and thus cannot bar plaintiff's claim. ................................................. 18

        2.  Plaintiff suffered prejudice because of the faulty SPD. ....................................................................... 21

    B.  Plaintiff is entitled to benefits under the terms of the Plan...................................................................................... 22

        1.  Reliance incorrectly concluded that plaintiff's occupation was sedentary. ................................................. 23

        2.  Reliance ignored the unanimous opinions of plaintiff's physicians that she was unable to perform the duties of even a sedentary occupation. .......................................................... 25

    C.  Plaintiff is entitled to pre-judgment interest on her wrongfully withheld benefits .......................................................... 34

VI.  Conclusion ........................................................................................... 36

## TABLE OF AUTHORITIES

**CASES CITED** <span style="float:right">**Page**</span>

Burke v. Kodak Retirement Income Plan, 336 F.3d 103 (2d Cir. 2003), cert. denied, 124 S. Ct. 1046 (2004)................................................... 18, 19, 21

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)............................ 26

Bowman v. Reliance Standard Life Ins. Co., No. 02 C 6188, 2003 U.S. Dist. LEXIS 4398, *20 (N.D Ill. March 21, 2003)............................................ 28

Conrad v. Reliance Standard Life Ins. Co., 292 F. Supp. 2d 333, 238 (D. Mass 2003) ....................................................................................... passim

Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001)............. 28

Couture v. UNUM Provident Corp., No. 02 Civ. 7392 (CM), 2004 U.S. Dist. LEXIS 7309, *32 (S.D.N.Y. April 13, 2003)........................................... 26

Davis v. NMU Pension & Welfare Plan, 810 F. Supp. 532 (S.D.N.Y. 1992)..................................................................................................... 20

Dobson v. Hartford Fin. Servs., 196 F. Supp. 2d 152, 174 (D. Conn. 2002)..................................................................................................... 36

Dodson v. Woodmen of the World Life Ins. Society, 109 F.3d 436, 439 (8th Cir. 1997)............................................................................................ 20

Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 115 (1989)..................................................................................................... 15

Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990))............................ 19

Jones v. UNUM Life Ins. Co., 223 F.3d 130, 139 (2d Cir. 2000) ........................ 34

Kinstler v. First Reliance Standard Insurance Co., 181 F.3d 243, 252 (2d Cir. 1999)............................................................................................. 24

Krizek v. CIGNA Group Ins., 345 F.3d 91, 100-01 (2d Cir. 2003)................. 28, 34

Lain v. Unum Life Ins. Co. of Am., 279 F.3d 337, 345 (5th Cir. 2002)................ 17

Lugo v. AIG Life Ins. Co., 852 F. Supp. 187, 195 (S.D.N.Y. 1994)..................... 18

Manginaro v. The Welfare Fund of Local 771, I.A.T.S.E., 21 F. Supp. 2d 284 (S.D.N.Y. 1998) ......................................................................... passim

Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) 28

Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985) ........................... 35

McNutt v. J.A. Jones Construction Co., 33 F. Supp. 2d 1375, 1380 (S.D. Ga. 1998)............................................................................................ 20

Miles v. New York State Teamsters Conference Pension & Retirement Fund, 698 F.2d 593, 598 (2d Cir. 1983)................................................... 17, 18

Moriarity v. United Tech. Corp. Represented Employees Retirement
Plan, 158 F.3d 157, 160 (2d Cir. 1998) ......................................................... 19

Paese v. Hartford Life & Accident Ins. Co., No. 02 Civ. 9778 (DC),
2004 U.S. Dist. LEXIS 6040, *28 & n.6 (S.D.N.Y. Apr. 9, 2004) ................... 26

Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) ..................... 15

Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862
F. Supp. 783, 791-82 (E.D.N.Y. 1994) ........................................................... 33

Smetana v. Reliance Standard Life Ins. Co., No. 01-CV-4339, 2003
U.S. Dist. LEXIS 19564, *22-24 (E.D. Pa. Sept. 30, 2003) ........................... 29

## STATUTORY PROVISIONS AND REGULATIONS

ERISA § 101(a), 29 U.S.C. § 1021(a), ................................................................. 18

ERISA § 102(b), 29 U.S.C. § 1022(b) ................................................................. 19

ERISA, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ............................................. 17

C.F.R. § 2520.102-3(l) ........................................................................................ 19


N.Y. C.P.L.R. § 201 ............................................................................................ 18

N.Y. C.P.L.R. § 213. ........................................................................................... 17

## I.    PRELIMINARY STATEMENT

Plaintiff Valerie A. Shore ("plaintiff") moves for summary judgment granting her long term disability benefits pursuant to the PaineWebber Long Term Disability Plan (the "Plan"), which is insured by a group long term disability insurance policy issued by defendant Reliance Standard Life Insurance Company ("Reliance") to plaintiff's former employer, defendant PaineWebber Inc. ("PaineWebber"), and dismissing defendants' affirmative defenses.  In support of her motion, plaintiff has submitted the following accompanying documents: the declaration of Valerie A. Shore ("Shore Decl."); the declaration of David S. Preminger with exhibits annexed ("Ex. __"); and plaintiff's statement pursuant to Local Rule 56.1 ("56.1 Statement").[1]

On January 15, 1999, plaintiff injured her back while moving heavy boxes at work.  She has been unable to work since that date, and subsequently has been diagnosed with a herniated disc, degenerative disc disease, lumbar radiculopathy and osteoarthritis.  Reliance properly paid plaintiff long term disability benefits from August 1999 until June 2000, when it erroneously concluded that plaintiff's occupation was sedentary and that plaintiff was able to perform the material duties of a sedentary occupation.  Despite plaintiff's timely appeal, Reliance has refused to reinstate plaintiff's benefits.

---

[1] Plaintiff named as defendants herein the Plan, Reliance Standard Life Insurance Company, PaineWebber, Inc. as Administrator of the Plan, and UBS PaineWebber Inc. as Administrator of the Plan. See Complaint, Ex. 1. The Plan is named solely to ensure that complete relief may be granted.  PaineWebber, Inc. and UBS PaineWebber Inc. are named in their capacities as Plan Administrators.  Reliance does not deny that it is a plan fiduciary under ERISA, see Answer at ¶ 7, Ex. 2, and Reliance made the decision to terminate plaintiff's benefits.  Thus, plaintiff seeks summary judgment against Reliance and the Plan (collectively, "defendants") at this time, and seeks to dismiss all defendants' statute of limitations affirmative defenses.

Defendants also assert as an affirmative defense that plaintiff's claim is time-barred for failure to commence suit within the abbreviated limitations period contained in the insurance policy governing plaintiff's benefits. However, because the summary plan description provided to plaintiff did not incorporate this limitations period, plaintiff cannot be penalized for failure to file within the time period set forth in that limitations period.

For the reasons that follow, plaintiff respectfully requests that this Court grant her motion for summary judgment, reinstate her long term disability benefits and dismiss defendants' affirmative defenses.[2]

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's employment with PaineWebber, Inc.

The relevant facts are set forth in detail in the Shore Decl. and plaintiff's 56.1 Statement. Briefly, in 1997, plaintiff began working for Correspondent Services Corporation, a subsidiary of PaineWebber Inc., with the title of Ethics Officer/Director of Continuing Education, and an annual salary of $75,000 and a guaranteed minimum annual bonus of $50,000. As an employee of PaineWebber, Plaintiff was a participant in the PaineWebber Long-Term Disability Plan (the "Plan"), issued by Reliance.[3] The Plan constitutes an employee welfare benefit plan within the meaning of section 3(1) of

---

[2] In their Answer, defendants assert fourteen paragraphs as affirmative defenses. See Answer, at p. 5-6, Ex. 2. Paragraphs 10 to 14 relate to the statute of limitations defense. The remaining paragraphs allege, *inter alia*, that plaintiff was given a full and fair review of her claim and is not totally disabled within the meaning of the policy. In this motion, plaintiff seeks summary judgment dismissing the statute of limitations affirmative defense. In the event that plaintiff is granted summary judgment on her claim for benefits, defendants' remaining affirmative defenses must also be dismissed.

[3] Copies of the summary plan description summarizing terms of the Plan and the insurance policy are included as Exs. 3 & 4.

the Employee Retirement Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §
1002(1).[4]

During her employment with PaineWebber, plaintiff was not provided with a copy
of the Reliance insurance policy governing the Plan (the "Policy"). See Shore Decl. ¶ 5.
The only Plan document that plaintiff received during her employment with
PaineWebber was a purported summary of the terms of the Plan. See id. ¶ 4. That
summary plan description ("SPD") does not describe plaintiff's rights as a participant of
the Plan, and does not include any information about filing or appealing a claim for
benefits. See Ex. 3. Instead, the section titled "Your Rights as a Plan Participant"
states that "[f]or further information about filing or appealing a claim and your rights as a
Plan participant, please refer to the *Legal and Administrative Overview* booklet." Ex. 3,
at p. 20. (emphasis in original). Plaintiff has never been provided with this booklet.
See Shore Decl. ¶ 5.

**B     The material duties of plaintiff's regular
          occupation**

In her position as Ethics Officer/Director of Continuing Education, plaintiff created
ethics and continuing education programs for the firms that cleared their business
through PaineWebber, was responsible for assisting these firms with audits by the
Securities Exchange Commission ("SEC") or the National Association of Securities
Dealers ("NASD"), hosted a weekly telecast serving these clients, and was required to

---

[4] After plaintiff ceased working due to her disability, UBS Financial Services Inc.
acquired PaineWebber, Inc. Defendants assert that the correct name of the long term
disability plan is now the "UBS Financial Services Inc. Long Term Disability Plan," see
Answer at ¶ 6, Ex. 2. Thus, UBS Financial Services has apparently assumed
administrative responsibility for the Plan. However, for purposes of this motion, plaintiff
refers to the Plan in effect at the time she became disabled, the terms of which govern
plaintiff's claims for benefits herein.

3

be up to date on applicable rules and regulations, and new facets and products of the finance industry. [AR0091][5]; see also Complaint, Ex. 1; Answer, Ex. 2, at ¶ 11. Plaintiff regularly attended seminars, Securities Industry Association, SEC and NASD events, and maintained relationships with law firms specializing in securities and employment law. [AR0091]; see also Complaint, Ex. 1; Answer, Ex. 2, at ¶ 11. Plaintiff also managed a national marketing support center for approximately thirty different investment products and produced national advertising, public relations, marketing campaigns and promotional events created to attract PaineWebber's clearing clients. [AR0091]; see also Complaint, Ex. 1; Answer, Ex. 2, at ¶ 11. In addition, plaintiff was also directly responsible for coordinating the printing of sensitive materials, which involved lifting, carrying and unpacking heavy boxes containing printed material, editing that material, shredding confidential material, and working closely with the printing companies. [AR0091]

Specifically, plaintiff's daily work activities included frequent computer work, making telephone calls for six to ten hours a day, and attending conferences, meetings and interviews within New York and out of state. [AR0091]; see also Complaint, Ex. 1; Answer, Ex. 2, at ¶ 13. Plaintiff was required to attend frequent seminars and conferences within New York and out of state, which often required that she sit for the entire day. [AR0091]. She was also responsible for hosting similar conferences, which required her to visit various sites to determine where to hold the conferences, meet with potential speakers, coordinate all aspects of the conferences and attend the conferences. Id. Plaintiff also hosted luncheons and dinners in New York and out of

---

[5] Citations to "[AR]" are to the administrative record produced by defendants, which is reproduced in its entirety as Ex. 5.

4

state. Id. Her daily working hours were, at a minimum, from 8:00 am to 6:00 pm. She also frequently worked from home at other than normal business hours, principally by computer and telephone. Id. Plaintiff traveled by subway, bus, ferry or taxi to get to work and to frequent meetings with clients. Id. She also traveled frequently to PaineWebber's offices in New Jersey and San Francisco, and regularly drove long distances to visit regional clients. Id. When attending conferences or meetings that were too far to drive to, plaintiff traveled by airplane. Id.

### C.    Plaintiff's injury and medical treatment

On or about January 15, 1999, plaintiff injured her back while lifting boxes full of printed material that needed to be shredded. She has been unable to return to work since January 19, 1999 because of persistent lower back pain, numbness in her feet and pelvis and urinary tract problems resulting from her back injury. Plaintiff has been under medical care for these problems since her injury.

An MRI of plaintiff's spine performed on February 9, 1999 showed that plaintiff has "a small left-sided prolapse of the L4-L5 intervertebral disc extending into the left lateral recess. . . . At L5-S1 there is a minimal posterior bulge on the left side." [AR0501] A subsequent MRI conducted on July 26, 2000 confirmed a "tiny mid left paracentral disc herniation L5-S1, . . . mild degenerative changes, . . . [and] a small left sided, left lateral disc herniation at L4-L5." [AR0104] Similarly, an electromyograph (EMG) conducted April 8, 1999 showed that plaintiff has an absent right peroneal nerve wave and mild neuropathic dysfunction in the muscles, supporting the conclusion that plaintiff has mild right-sided dysfunction at the L5 disc. [AR0453-55]

Plaintiff has been diagnosed as suffering from lumbar radiculopathy caused by a herniated disc and a bulging disc at the lumbosacral level. [AR92-93] As plaintiff's physician, Dr. Frederick Swerdlow, stated on July 24, 2000, the severe lower back and pelvic area pain and numbness experienced by plaintiff "are characteristic of lumbar radiculopathy and the discogenic problem previously documented on the MRI test." [AR0099] Because of the complex nature of plaintiff's injuries, she has been treated by multiple physicians, including an orthopedic surgeon (Dr. Sheldon Lichtblau) [AR0457-59], two spinal surgeons (Dr. Charles Gatto [AR448-56] and Dr. William Kennedy Main [AR 0514-17]), a rheumatologist (Dr. Swerdlow) [A0092-113], and a urologist (Dr. Jonathan Vapnek) [AR0157-68], and has also received extensive physical therapy [AR0171].[6] In addition, plaintiff was examined by several doctors in connection with her worker's compensation claim (Dr. Fred Hochberg [AR0137-39] and Dr. Samir Dutta [AR0114-15]).

Plaintiff's painful symptoms are exacerbated if she sits or stands for more than thirty or forty minutes at a time, and she needs to change her position frequently. [AR0402-03, AR0181-84, AR0099, AR0111, AR0113, AR0114-15, AR0178] Since her injury, plaintiff has been able to walk for only short distances, and she spends much of the day lying down, which relieves the pain somewhat. [AR0183-84] In order to manage her pain, plaintiff takes prescription anti-inflammatory and pain medication, and muscle relaxants, including Celebrex, Naprosyn, Valium, Flexeril, Ambien, Vicodin, and Hydrocodone. [AR0092-93, AR0114, AR0169-70, AR0424-26, AR0439, AR0505]

---

[6] Plaintiff explained the nature of her relationships with these different physicians by letter to Reliance dated April 21, 2000. [AR0369]

Many of these medications cause drowsiness and interfere with plaintiff's ability to
concentrate. [AR0099, AR0181, AR0273]

### D.     The Administrative Process[7]

#### 1.     Plaintiff's initial application for LTD benefits.

Plaintiff applied to Reliance for LTD benefits in June 1999. [AR0272-74]   In her
initial claim, plaintiff stated that she was unable to work because she suffered from
extreme pain when sitting, standing and walking, nerve pain in her right leg and feet,
numbness in her foot, buttock and pelvic areas, and urinary tract problems, and was
drowsy and experienced unclear thinking while on pain medication. [AR0273]  Plaintiff's
claim was granted by Reliance on August 18, 1999, and LTD benefits were paid at a
rate of $4,239.05 per month. [AR0214-15]

#### 2.     Plaintiff provided proof of disability to Reliance.

After approving plaintiff's claim, Reliance requested additional information from
plaintiff's treating physicians.  The information provided to Reliance included:

- An MRI performed February 9, 1999 finding that plaintiff has "a small left-sided
  prolapse of the L4-L5 intervertebral disc extending into the left lateral recess. . . .
  At L5-S1 there is a minimal posterior bulge on the left side." [AR0501]

- A certificate of disability form completed by Dr. Charles Gatto dated March 26,
  1999, concluding that plaintiff was not capable of doing her usual work and that
  plaintiff was incapable of lifting, squatting, bending or climbing and would need
  frequent breaks for changes of position. [AR0484-85]

- EMG test results dated April 8, 1999 showing an absent right peroneal nerve
  wave and mild neuropathic dysfunction in the muscles, supporting the conclusion
  that plaintiff had mild right-sided dysfunction at the L5 level. [AR0404]

- An April 22, 1999 report from Dr. Charles Gatto indicating that plaintiff had been
  to physical therapy without improvement, and that her symptoms of pain and
  numbness were exacerbated by sitting for more than thirty minutes. [AR0402]

---

[7] As previously noted, the complete administrative record is reproduced as Ex. 5.

7

Dr. Gatto observed that plaintiff's MRI shows "some degenerative disc disease with some annular bulging at the L4-5 level with some foraminal stenosis from the disc annulus on the left side at that level to a mild to moderate degree. . . . Her EMG is consistent with mildly abnormal L5 right-sided dysfunction." [AR0402]

- An April 29, 1999 report from Dr. William Kennedy Main noting that plaintiff had been initially treated with bed rest for two months, and that her "complaints include lower back pain, right leg pain and numbness in the pelvis, buttocks, feet and in the right leg. She says it hurts to stand, sit or to lay down and she has difficulty sleeping at night. Her treatment up until now has included physical therapy and acupuncture. Current medications include . . . Naprosyn, Vicoden and Flexeril." [AR0439] Dr. Main stated that the "MRI scan of the lumbar spine reveals a disc herniation at L4-L5, where there is a loss of disc space height and loss of signal within the disc itself. The L5-S1 disc also appears to have some desiccation." [AR0439] He concluded that "Valerie has primarily mechanical back pain related to a disc injury dating back to her work related incident on January 15, 1999" and recommended a prolonged course of physical therapy before considering more invasive treatment. [AR0439-40]

- Physical therapy notes dated May 5, 1999 documenting that plaintiff was taking Naproxen, Flexeril and Hydrocodon for pain, and that plaintiff suffered pain from sitting approximately five minutes into the treatment session. [AR0424-26]

- Physical therapy notes dated May 10, 1999 documenting that plaintiff's pelvis became numb approximately four minutes into therapy when seated. [AR0430]

- A "Physician's Statement" completed by Dr. Main for Reliance in July 1999, stating that plaintiff suffers from a lumbar herniated disc at the L4-L5 level, with low back pain radiating down her left leg. Dr. Main also stated that plaintiff was currently prescribed Flexeril and Vicodin, and has "primarily mechanical back pain related to disc injury dating back to her work related incident on January 15, 1999." [AR0505-06] Dr. Main further stated that plaintiff could stand and sit for only one to three hours per day, and could not walk or drive at all. [AR0506]

- An August 5, 1999 report from Dr. Fred Hochberg indicating that plaintiff "is still considered to have a moderate partial disability" and recommending that plaintiff attend additional physical therapy. [AR0478]

- An August 17, 1999 report from Dr. William Main indicating that plaintiff "continues to complain of lower back pain, urinary tract problems, numbness in the pelvis, upper hip, and the feet. She has pain with standing, sitting or lying." [AR0360] Dr. Main also noted that while he did not presently recommend spinal surgery, "[i]t is a common situation that patients have concurrent back pain, sciatica and other lower extremity symptoms in conjunction with urinary complaints, although no obvious cause can be found for the latter." [AR0360-61]

On October 13, 1999, plaintiff attended a brief examination with Dr. Edward
Adler, at the request of Reliance. [AR0394] In his report summarizing the examination,
Dr. Adler noted tenderness in the lumbrosacral junction and that plaintiff's "lumbar spine
is quite stiff and flexion and extension of the spine are limited by pain." [AR0385] He
observed that plaintiff did "not have difficulty getting on and off the examination table,
but does have difficulty taking her shoes on and off." [AR0385] In his conclusions, Dr.
Adler diagnosed plaintiff with "[d]egenerative disc disease and mechanical low back
pain," and suggested that plaintiff could take non-steriodial medication or Tylenol for her
pain. [AR0386] On the "Physical Capacities Assessment" form completed by Dr. Adler
for Reliance, there is no indication of how many hours per day plaintiff could walk, sit or
stand. [AR0387] However, Dr. Adler nonetheless opined that plaintiff "is capable of
sedentary desk work" and could return to work if the urodynamic test results were
normal.[8] [AR0388] There is no explanation in the report as to how this conclusion was
reconciled with the repeated conclusions from plaintiff's physicians that plaintiff was not
capable of even sedentary work.

Reliance then requested that Consultative Review & Rehabilitation Inc. interview
plaintiff and prepare a report regarding plaintiff's potential for vocational rehabilitation.
[AR0327-32] The report details an October 6, 1999 interview with plaintiff, in which
plaintiff indicated that she has been seen by five different physicians since her injury,

---

[8] Because of plaintiff's incontinence, she was referred to a urologist, Dr.
Jonathan Vapnek. Plaintiff subsequently provided Reliance with a report from Dr.
Vapnek dated November 2, 1999, which stated that while the urodynamic testing had
shown few abnormalities, an "elevation in urethral sphincter pressures is commonly
seen in those with back problems," and "[i]t might be instructive to repeat the testing
when the patient is symptomatic." [AR0365]

was taking Valium, Naprosyn, Advil, Pridium and an anti-spasmodic medication, and that plaintiff "spends most of her time lying down in her apartment and is only able to engage in even the minimal amount of physical activity for one to two hours per day." [AR0330]

### 3. Reliance erroneously terminated plaintiff's benefits in June 2000.

By letter dated June 19, 2000, Reliance informed plaintiff that it had concluded that she was no longer disabled. [AR0266-68] Reliance stated, in reliance on the opinion of Dr. Adler, that because the urodynamic testing did not show any abnormalities, plaintiff was capable of performing sedentary work. [AR0267] Reliance did not discuss the nature of the material duties of plaintiff's occupation or the opinions of plaintiff's treating physicians that plaintiff was not capable of even sedentary work because she was unable to sit for more than one to two hours per day.

### 4. Plaintiff's administrative appeal

On November 20, 2000, plaintiff's former counsel submitted plaintiff's appeal with accompanying exhibits. [AR0043-AR0189] In the appeal, plaintiff's former counsel provided information to Reliance regarding the nature of the material duties of plaintiff's occupation, which showed that such occupation was not sedentary as it required frequent travel, hosting and organizing seminars and conferences, conducting tours, and lifting and carrying heavy boxes in connection with coordinating the printing of confidential material. [AR0045-46, AR0091]

Plaintiff's former counsel also provided updated medical information to Reliance, including a November 14, 2000 report from Dr. Frederick Swerdlow who opined that plaintiff was unable to "work in any capacity because of difficulty sitting even for short

10

periods of time and difficulty walking and standing. . . .  Her limitation of ability to sit in

particular makes working even at a sedentary job impossible." [AR0093] Dr. Swerdlow

also confirmed that plaintiff was taking prescription pain medication and muscle

relaxants including Celebrex, Flexeril, Valium and Ambien. [AR0092] Plaintiff's appeal

also contained additional medical reports from Dr. Swerdlow, including his July 24, 2000

statement that plaintiff:

> continues to experience pain in the lower back with paresthesias especially
> severe in the lower back and pelvis as well as the lower extremities. . . .  These
> clinical problems are characteristic of lumbar radiculopathy and the discogenic
> problem previously documented on the MRI test. Her symptoms are worsened
> by sitting in particular or standing for prolonged periods of time and some
> problems are typically experienced within the context of her established
> diagnosis of discogenic disease. She continues to require treatment with anti-
> inflammatory medication as well as muscle relaxants along with analgesics but
> unfortunately the use of these medications interferes with her ability to
> concentrate.

[AR0099]; see also March 31, 2000 report (stating that plaintiff is under his care for the

treatment of "lumbar radiculopathy in the setting of degenerative disc disease,"

confirming that plaintiff "remains disabled as a consequence of this injury and continues

to require ongoing care . . . ") [AR0098]; March 31, 2000 examination notes (indicating

that Dr. Swerdlow prescribed a trial of Ultram, an opiate pain medication) [AR0102];

June 15, 2000 Physical Capacities Evaluation form (stating that plaintiff was limited in

standing and/or walking to less than two hours per day, and could sit for less than six

hours per day (the highest degree of impairment that can be indicated on the form)

[AR0111]; April 10, 2000 form (same limitations) [AR0113].

Plaintiff's appeal also included an April 7, 2000 "Physical Capacities Evaluation"

form completed by plaintiff's physical therapist indicating that plaintiff could carry up to

five pounds, can frequently carry only one to two pounds, can stand and walk for less

than two hours per day, can sit for less than six hours per day, is limited in her ability to push or pull and has limited strength in her lower legs, as well as a September 28, 1999 report from the physical therapist stating that plaintiff could carry three pounds, stand and walk for less than two hours per day, and sit for less than six hours per day. [AR0374, AR0153]

In addition, the appeal included an opinion from Dr. Samir Dutta, who stated that "[c]laimant takes Advil for pain and Hydrocodone . . . . She cannot drive. She lives on her own. She can sit for 45 minutes, stand for 45 minutes, walk for five to six blocks, and can carry about five lbs. maximum. She spends her time at home, doing some light household chores." He further noted that plaintiff's "[s]pine shows moderate paraspinal muscle spasm." His diagnosis was that plaintiff suffered from a herniated disc at L4-5 as well as a bulging disc L5-S1 with right lumbar root radiculopathy. He concluded that "[c]laimant's conditions are chronic in nature, and not likely to improve completely. . . . Claimant can sit for one to two hours, stand for one to two hours, walk for eight to ten blocks, and can carry about 10-15 lbs." [AR0114-15]

Plaintiff's former counsel also provided Reliance with a decision by the Social Security Administration finding that plaintiff was unable to work. [AR172-180] The administrative law judge expressly found that plaintiff's "own subjective allegations" regarding her pain and impairment were "credible." The judge also concluded that plaintiff was "able to lift or carry up to only 10 pounds, and to sit for up to only two hours and stand or walk for only two hours in an eight-hour workday." [AR0178]

Finally, plaintiff provided an affidavit in which she detailed the nature of her back pain and numbness in her extremities. [AR0181-84] Specifically, plaintiff stated that

she takes medication, including Celebrex, Valium and pain relievers, but tries not to do
so with frequency even when she is in great pain because of her concern about
addiction. [AR0181] Plaintiff stated that she is unable to sit for more than
approximately thirty-five minutes without experiencing severe pain and numbness, and
that she spends most of the day lying down. [AR0183-84] Plaintiff also provided
Reliance with a list of medication prepared in conjunction with her Social Security
application, indicating that she was presently taking extensive prescription pain
medication, including Naproxen, Flexeril, Ambien, Hydrocodone, Sulindac, Celebrex
and Vicodin. [AR0169-70]

To supplement the record, by letter dated January 22, 2001, plaintiff's former
counsel provided Reliance with a decision from the New York State Workers
Compensation Board concluding that plaintiff was permanently partially disabled.
[AR0023-25]

> 5.    Reliance wrongly determined that plaintiff's
> occupation is sedentary and that plaintiff can
> perform the duties of a sedentary occupation.

On January 25, 2001, a claim review of plaintiff's file was conducted by Dr.
William Scott Hauptman.[9] [AR0012-0019] Dr. Hauptman did not examine plaintiff or
contact her, see Shore Decl. ¶ 15, nor does his report or the claim file indicate that he
contacted any of plaintiff's treating physicians. Dr. Hauptman's conclusion that plaintiff
"can function at the sedentary level with the proviso that she can have breaks as
necessary to stand up and move around," was alleged to be based upon the "minimal

---

[9] Dr. Hauptman purports to be board certified in internal medicine and
gastroenterology; neither specialty is relevant to plaintiff's claim of disabling back pain.
[AR0012]

13

findings of the objective studies (MRI and EMGs) that this patient has had." [AR0018-19] He also cited the fact that plaintiff indicated she took Advil for pain in February 2000 when she went to see Dr. Swerdlow, noting that "[p]atients with severe lower back pain that would disable them from a sedentary occupation routinely require significant pain medication for control of their symptoms."[10] [AR0019] Finally, Dr. Hauptman stated that plaintiff was able toget on and off the examining table without assistance, but made no effort to explain how this fact rebutted the medical evidence in the record from plaintiff's treating physicians that plaintiff was unable to sit or stand for any period of time without suffering severe pain, numbness and incontinence. [AR0019]

By letter dated February 16, 2001, Reliance denied plaintiff's appeal. [AR0005-0011] In its denial, Reliance stated that "[w]hile we understand that you claim Ms. Shore's *job* requires a great deal of physical exertion, her *occupation* is classified as sedentary duty by the United States Department of Labor's Dictionary of Occupational Titles ("DOT") (emphasis in original). [AR0006] Reliance then summarized the medical information in plaintiff's file, and concluded, relying heavily on the claim review by Dr. Hauptman, that plaintiff was capable of sedentary work:

> While Ms. Shore may continue to have some complaints of pain, it appears this pain is controlled with medication which is taken on an as needed basis. The records of Ms. Shore's physicians, specifically Dr. Hochberg and Dr. Adler[11],

---

[10] While Dr. Hauptman's report did note that Dr. Swerdlow prescribed plaintiff with prescription anti-inflammatory drugs in March 2000, as discussed below, that fact was inexplicably ignored by both Dr. Hauptman and Reliance in their conclusions. In addition, as Dr. Hauptman noted in his review of the medical records but again ignored when reaching his conclusion, plaintiff was subsequently prescribed Celebrex (an anti-inflammatory), Flexeril (a muscle relaxant), Ambien (a sedative) and Valium. [AR0016] Dr. Hauptman also ignored the evidence that plaintiff was prescribed Vicodin and Hydrocodone for her pain. [AR0169-70]

[11] It should be noted that neither Dr. Adler nor Dr. Hochberg are plaintiff's treating physicians. Dr. Adler was the independent medical reviewer commissioned by Reliance

14

note that Ms. Shore was able to mount and dismount the examination table without any assistance. As the medical records in the claim file do not document a condition so severe [that] it would render her unable to perform the material duties of her occupation, Ms. Shore no longer meets the applicable definition of "Total Disability," as previously quoted, and no further benefits are payable in connection with this claim.

[AR0010]

Plaintiff has exhausted the Plan's administrative claim procedures.

## III.    STANDARD OF REVIEW

In Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that a deferential standard of review applies to the denial of claims only where the plan language confers on the plan administrator (or some other person or entity) the power to construe uncertain terms or provides that eligibility determinations are to be given deference. Plaintiff does not dispute that the Policy grants discretion to Reliance. See Ex. 4, at p. 4.0. Under this standard, a decision to deny benefits is arbitrary and capricious where, as here, it is "without reason, unsupported by substantial evidence [or] erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (quotation and citation omitted).

## IV.    THE PLAN

It is undisputed that plaintiff is a participant in the Plan and, thus, is eligible for LTD benefits if she meets the Plan's definition of "Total Disability." Indeed, Reliance paid plaintiff benefits for almost a year before deciding that she was no longer disabled, notwithstanding the absence of medical evidence showing an improvement in plaintiff's condition.

---

to examine plaintiff on August 13, 1999. Plaintiff was referred to Dr. Hochberg in conjunction with her application for worker's compensation benefits.

Under the Plan, plaintiff is entitled to long term disability ("LTD") benefits payable through age sixty-five, commencing after a 180 day elimination period. The monthly LTD benefit is 60% of the Plan participant's average monthly salary from the three prior years, up to a maximum benefit of $12,500 per month. See Ex. 4, at p. 1.0.

The Policy governing plaintiff's benefits defines "Totally Disabled" and "Total Disability" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
>
> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability' and
>
> (3) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

See Ex. 4, at p. 2.1.

Because Reliance terminated plaintiff's LTD benefits before benefits had been paid for twenty-four months, plaintiff's entitlement to benefits is to be determined based

on the first definition of disability, namely, whether plaintiff could "perform each and
every material duty of [her] regular occupation." In other words, plaintiff is disabled
within the meaning of the policy if she is unable to perform any of the material duties of
her occupation as an Ethics Officer/Director of Continuing Education. See Lain v. Unum
Life Ins. Co. of Am., 279 F.3d 337, 345 (5th Cir. 2002) (interpreting similar policy
language and holding that "[a] fair reading of the Policy supports the view that in order
to be considered disabled, an insured must be unable to perform only a single material
duty of her occupation").

As discussed below, plaintiff was unable to perform the material duties of her
occupation when her benefits were terminated in June 2000, and she remains unable to
perform the material duties of any occupation to which her "education, training, or
experience will reasonably allow."

## V.    DISCUSSION

### A.    Plaintiff's claim is timely and the Policy's three year limitations period does not apply.

ERISA does not contain a specific statute of limitations for claims for benefits
under the terms of a plan brought under ERISA § 502(a)(1)(B), 29 U.S.C. §
1132(a)(1)(B), such as the instant claim. Instead, courts have held that the most closely
analogous state statute of limitations is to be used. See Miles v. New York State
Teamsters Conference Pension & Retirement Fund, 698 F.2d 593, 598 (2d Cir. 1983).
Here, the most closely analogous state limitations period is New York's six year
statutory limitations period for breach of contract claims, as set forth in N.Y. C.P.L.R. §
213. See id. For purposes of this six year limitations period, a claim for benefits under
§ 502(a)(1)(B) accrues "when there has been a repudiation by the fiduciary which is

clear and made known to the beneficiaries." Miles, 698 F.2d at 598. Plaintiff's appeal was ultimately denied by Reliance on February 16, 2001. [AR0005-11] As the instant action was filed on June 2, 2004, well within six years of February 16, 2001, plaintiff's claim is timely.

Defendants, however, assert as an affirmative defense that plaintiff's claim is untimely because the Policy contains three year limitations period. See Answer, at p. 5-6, Ex. 2. New York law does provide that the six-year statutory limitations period applicable to breach of contract actions may be shortened by written agreement. See N.Y. C.P.L.R. § 201; see also, e.g., Lugo v. AIG Life Ins. Co., 852 F. Supp. 187, 195 (S.D.N.Y. 1994) (upholding application of a contractual limitations period in an ERISA case). However, defendants' affirmative defense must fail because the SPD provided to plaintiff does not include this contractual limitations period. As set forth in greater detail below, if the SPD does not comply with ERISA, it cannot be used to deny a participant's entitlement to benefits. See, e.g., Burke v. Kodak Retirement Income Plan, 336 F.3d 103 (2d Cir. 2003), cert. denied, 124 S. Ct. 1046 (2004); Manginaro v. The Welfare Fund of Local 771, I.A.T.S.E., 21 F. Supp. 2d 284 (S.D.N.Y. 1998). Accordingly, plaintiff's claim is timely and defendants' affirmative defense based on the statute of limitations should be dismissed.

    1. The SPD fails to comply with ERISA and thus
       cannot bar plaintiff's claim.

ERISA § 101(a), 29 U.S.C. § 1021(a), requires the administrator of any ERISA plan to furnish each participant and beneficiary with a summary plan description. "The SPD must be written in a manner calculated to be understood by the average plan participant and must be sufficiently accurate and comprehensive to appraise

participants and beneficiaries of their rights and obligations under the plan." Burke, 336 F.3d at 110 (citing 29 U.S.C. § 1022(a)). In order to protect participants and beneficiaries, ERISA specifically requires that the SPD include, *inter alia*, "a description of the . . . circumstances which may result in disqualification, ineligibility or denial or loss of benefits, … the procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 503 of this Act)." 29 U.S.C. § 1022(b); see also 29 C.F.R. § 2520.102-3(*l*).

The Second Circuit has held that "[w]here the terms of a plan and the SPD conflict, the SPD controls." Burke, 336 F.3d at 110 (citing Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990)). The court expressly recognized that ERISA "contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supersede the terms of the Booklet would defeat the purpose of providing the employees with summaries." Heidgerd, 906 F.2d at 907-08; see also Moriarity v. United Tech. Corp. Represented Employees Retirement Plan, 158 F.3d 157, 160 (2d Cir. 1998). Similarly, the omission of information in the SPD that is contained in the Plan creates a conflict. See Burke, 336 F.3d at 111 ("Because the relevant section of the SPD omits the affidavit requirement [set forth in the plan], it conflicts with the Plan.").

Here, the SPD provided to plaintiff by PaineWebber during her employment does not include any information at all regarding the three year limitations period. Instead, the SPD stated that "[f]or further information about filing or appealing a claim and your

19

rights as a Plan participant, please refer to the *Legal and Administrative Overview* booklet." Ex. 3, at p. 20 (emphasis in original). That booklet, however, has never been provided to plaintiff. See Shore Decl. at ¶ 5. Thus, the SPD, the sole information given to plaintiff describing the terms of her benefits, plainly fails to inform participants and beneficiaries of their remedies under the Plan, and, more importantly for the purposes of this action, fails to inform participants and beneficiaries that the period for bringing a legal action has been shortened by the Policy.

Courts consistently have held that the failure to include language in the SPD regarding time limits which, if not met, can result in a loss of benefits, is a clear violation of ERISA. See, e.g., Dodson v. Woodmen of the World Life Ins. Society, 109 F.3d 436, 439 (8th Cir. 1997); McNutt v. J.A. Jones Construction Co., 33 F. Supp. 2d 1375, 1380 (S.D. Ga. 1998); Manginaro, 21 F. Supp. 2d at 294; Davis v. NMU Pension & Welfare Plan, 810 F. Supp. 532 (S.D.N.Y. 1992). "Because the time deadlines are such an integral part of the insurance plan, failure to include them in the SPD violates ERISA's requirements for plan summaries that provide employees with the essential information regarding their plans." McNutt, 33 F. Supp. 2d at 1380.

Because the SPD, the primary source of a participant's information about plan benefits, did not provide plaintiff with any information about the existence of a three year limitations period, that limitations period cannot now be enforced by defendants. See Manginaro, 21 F. Supp. 2d at 294 ("although the six-year limitations period of N.Y.

C.P.L.R. § 213 may be shortened by the Plan, such a limitation will not be enforced unless it was properly disclosed to plaintiffs via the SPD").[12]

### 2. Plaintiff suffered prejudice because of the faulty SPD.

In this Circuit, a Plan participant seeking to enforce the terms of an SPD need not demonstrate detrimental reliance on the faulty SPD. See Burke, 336 F.3d at 111-12. Instead, a Plan participant need only show that she "was likely to have been harmed as a result of the deficient SPD." Id. at 113. The Second Circuit adopted this rule in recognition of the fact that because ERISA "and the [Department of Labor] regulations place the burden on employers to draft an SPD that is accurate, comprehensible, and clear regarding restrictions on eligibility for benefits, . . . [t]he consequences of an inaccurate SPD must be placed on the employer." Id. (citations omitted).

Here, plaintiff was provided with a copy of the SPD during her employment with PaineWebber, as required by ERISA. See Shore Decl. at ¶ 4. Plaintiff reviewed that SPD in connection with her claim for benefits from the Plan. Id. at ¶ 7. Had the three year limitations period been disclosed in the SPD, as required by ERISA, plaintiff would have been aware of it and would have filed suit within those time limits. Id. at ¶ 13. Instead, because of the failure to include the limitations period in the SPD, plaintiff believed that the general statute of limitations under New York law would apply. Id. Moreover, plaintiff never had, and, therefore, never reviewed, the applicable Policy. Id.

---

[12] This holding was cited with approval by the Second Circuit in Burke. See Burke, 336 F.3d at 113 ("The district court [in Manginaro] ruled, in accordance with Second Circuit precedent, that because the plan and the SPD were in conflict, the SPD controlled.").

at ¶¶ 8-10. It was not until plaintiff contacted counsel in April 2004 that she was advised that a shorter limitations period might apply. Id.[13]

Because the SPD, plaintiff's sole source of information about her benefits under the Plan, was silent, plaintiff had no reason to believe that any period shorter than that provided by New York law would apply.[14] See Manginaro, 21 F. Supp. 2d at 296. In light of the plain prejudice to plaintiff caused by the faulty SPD, defendants cannot now rely on a contractual limitations period that was undisclosed to plaintiff to bar her claim.

### B.     Plaintiff is entitled to benefits under the terms of the Plan

Under the Plan, plaintiff is entitled to LTD benefits if she "cannot perform the material duties of [her] regular occupation." Ex. 4, at p. 2.1. As discussed above, plaintiff's occupation was not sedentary. Instead, plaintiff was required to: coordinate, host and attend frequent conferences, seminars and meetings; travel extensively to meetings with clients; and lift and carry heavy boxes while coordinating the printing of sensitive material for which she was personally responsible. See pp. 3-5, supra. As a

---

[13] In fact, it was not until October 6, 2004 that plaintiff's current counsel was finally provided with a copy of the Policy governing plaintiff's benefits. See Ex. 6. Plaintiff's former counsel had been provided only with a copy of an insurance policy applicable to employees earning over $250,000, which plaintiff did not, and a copy of the policy applicable to employees in plaintiff's wage bracket in effect as of 1994, which had been amended in 1997. See Shore Decl. ¶¶ 8, 10. Plaintiff did not review either of those policies. See id. ¶ 9. And, even if plaintiff had knowledge of the contents of those policies, it would be irrelevant as neither of these two policies was the policy governing plaintiff's claim for benefits.

[14] While detrimental reliance is not required under the Second Circuit's standard, plaintiff obviously cannot have "relied" on the absence of language in the SPD. However, she clearly was prejudiced by the fact that the SPD, contrary to ERISA's requirements, failed to provide her with information about the time limits contained in the Policy.

result of her injuries, plaintiff is now unable to sit for more than one to two hours per day, and is similarly limited in her ability to stand and walk. She must spend a good portion of each day lying down, and she takes pain medication and muscle relaxants that leave her drowsy and unable to concentrate. See pp. 5-7, supra. There is simply no evidence in the administrative record that plaintiff is able to perform the material duties of her occupation, given her medical limitations. Thus, plaintiff is entitled to retroactive LTD benefits.

In denying plaintiff's appeal, Reliance committed multiple serious errors. First, it utilized an entirely inaccurate occupational job description to support its conclusion that plaintiff's occupation was sedentary. Second, it ignored the unanimous opinions of plaintiff's physicians regarding her restrictions and limitations, and cited only the fact that plaintiff was able to get on and off the examination table without assistance as evidence that plaintiff could perform sedentary work. Third, Reliance ignored the fact that plaintiff is required to take extensive pain medication and muscle relaxants, which cause drowsiness and impair plaintiff's ability to focus. In short, Reliance's denial of plaintiff's claim was arbitrary and capricious, and her LTD benefits should be reinstated.

       1.    Reliance incorrectly concluded that plaintiff's
            occupation was sedentary.

In support of plaintiff's appeal, plaintiff's then-counsel included a description of plaintiff's duties as Ethics Officer/Director of Continuing Education. However, Reliance ignored that description and instead cited a Department of Labor occupational description applicable to "Educational Program Directors." The occupational description indicates that the position described is sedentary, and involves "lifting, carrying, pushing, pulling 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for

brief periods of time." [AR0342] As a comparison of plaintiff's actual duties with the occupational description reveals, this occupational description does not accurately describe the material duties of plaintiff's occupation as the Ethics Officer/Director of Continuing Education at Correspondent Services Corp.

In Kinstler v. First Reliance Standard Insurance Co., the Second Circuit held that when the term "regular occupation" is not defined by the Policy itself, "'the applicable definition of 'regular occupation' shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties.'" 181 F.3d 243, 252 (2d Cir. 1999) (quoting Dawes v. First Unum Life Ins. Co., 851 F. Supp. 118, 122 (S.D.N.Y. 1994)). In Kinstler, the defendant, like Reliance here, had used a general job description from the Department of Labor's Dictionary of Occupational Titles that indicated that the plaintiff's position was sedentary. The Second Circuit held that regardless of a plaintiff's job title, a plaintiff's "'regular occupation' may not be defined without some consideration of the nature of the institution where she was employed. Though her 'regular occupation' is not to be defined so narrowly as to include only the characteristics of her job . . ., it must be defined as a position of the 'same general character' as her job.'" Id. at 253.

Reliance's determination here that although plaintiff's "job requires a great deal of physical exertion, her occupation is classified as sedentary by the United States Department of Labor's Dictionary of Occupational Titles," [AR0006], incorrectly focuses on an inapposite job description and ignores the character of the duties of plaintiff's occupation, in violation of Kinstler, and in a flagrant abuse of discretion. As Reliance repeatedly had been informed, plaintiff's duties required her to travel frequently, to plan,

coordinate and attend all day meetings and educational conferences, and to coordinate

the printing of confidential material. Meetings with nation-wide clients and at

PaineWebber's offices in New Jersey and San Francisco required plaintiff to regularly

drive long distances and to travel by airplane. These obligations were critical parts of

plaintiff's occupation as Ethics Officer/Director of Continuing Education for

PaineWebber's clearing clients. Unlike the Department of Labor occupational

description, plaintiff's duties demanded intensive walking and standing, as well as lifting

and carrying heavy boxes. Thus, plaintiff's duties required far more than sedentary

activity.

As there is absolutely no evidence in the record that plaintiff was able to perform

more than a sedentary occupation, or, as discussed below, that plaintiff was even able

to perform the duties of a sedentary occupation, Reliance's determination that plaintiff

was no longer disabled was a clear abuse of discretion.

> 2.    Reliance ignored the unanimous opinions of
>        plaintiff's physicians that she was unable to
>        perform the duties of even a sedentary
>        occupation.

Moreover, even if plaintiff's occupation were properly classified as sedentary,

there is extensive evidence in the record that plaintiff is unable to perform even

sedentary work because she is unable to sit for more than one to two hours per day

without suffering severe pain and numbness in her back and lower extremities. See pp.

5-7, 10-13, supra. Citing a claim review by Dr. William Scott Hauptman, however,

Reliance erroneously concluded that plaintiff was able to perform the requirements of a

sedentary occupation. Reliance's determination that "the medical records do not

document a condition so severe [that] it would render [plaintiff] unable to perform the

material duties of her occupation" [AR0010], impermissibly ignores the unanimous opinions of plaintiff's treating physicians that plaintiff was unable to work at even a sedentary occupation.

In Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), the Supreme Court held that courts engaging in arbitrary and capricious review of an administrator's decision cannot impose a presumption in favor of a claimant's treating physician or require administrators to expressly state the reasons that they have not accepted the opinion of a treating physician. Id. at 834. The Court emphasized, however, that this holding does not give administrators license to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. As courts within this district have recognized, "[t]he fact that the treating physician rule is inapplicable does not in any way suggest that plaintiff's doctors' opinions are irrelevant." Couture v. UNUM Provident Corp., No. 02 Civ. 7392 (CM), 2004 U.S. Dist. LEXIS 7309, *32 (S.D.N.Y. April 13, 2003); see also Paese v. Hartford Life & Accident Ins. Co., No. 02 Civ. 9778 (DC), 2004 U.S. Dist. LEXIS 6040, *28 & n.6 (S.D.N.Y. Apr. 9, 2004) (recognizing that the opinions of a treating physician may be persuasive).

Plaintiff's treating physicians and physical therapists have consistently expressed their medical opinions, based on their actual treatment of plaintiff, that she is able to sit for "less than six [hours] per day." See, e.g., June 15, 2000 opinion of Dr. Swerdlow [AR0111]; April 10, 2000 opinion of Dr. Swerdlow [AR0113]; April 7, 2000 opinion of plaintiff's physical therapist [AR0153]; September 28, 1999 opinion of plaintiff's physical therapist [AR0374]. This was the lowest degree of capacity that could be indicated on those forms and does not, therefore, indicate that plaintiff could sit for even six hours

26

per day.[15]  Indeed, plaintiff's physicians also indicated that she is unable to engage in

full-time sedentary work. See, e.g., November 14, 2000 report from Dr. Swerdlow

(plaintiff was unable to "work in any capacity because of difficulty sitting even for short

periods of time and difficulty walking and standing. . . . Her limitation of ability to sit in

particular makes working even at a sedentary job impossible.") [AR0093]; see also July

24, 2000 opinion of Dr. Swerdlow ("Her symptoms are worsened by sitting in particular

or standing for prolonged periods of time . . . .") [AR0099]; October 8, 1999 opinion of

Dr. Dutta (plaintiff "can sit for one to two hours, stand for one to two hours, walk for eight

to ten blocks, and can carry about 10-15 lbs.") [AR0115]; June 1999 opinion of Dr. Main

(plaintiff can sit for one to three hours); May 1999 physical therapy notes (stating that

plaintiff began to experience pain in treatment after sitting for five minutes) [AR0424-

26].[16]

Similarly, plaintiff's own statements confirm that she can only sit for

approximately thirty-five minutes at a time because of pain and numbness, has to lie

down frequently during the day, and requires pain medication that makes her extremely

drowsy and forgetful. [AR0182-83]  As the Second Circuit has held, "the subjective

---

[15] Plaintiff's occupation frequently required her to sit for more than six hours a day while working at the computer or on the telephone, or while traveling. [AR0091]

[16] Dr. Gatto did state in April 1999 that plaintiff "should be able to return to work in some limited capacity . . . she would need ot [sic] have light duty capacity, no lifting or bending. She would need frequent positional changes with the ability to sit, stand and lie down during the day at certain periods. This may even be on an hourly basis as per her subjective description as to when these pains and paresthesias come about." [AR0403]  Dr. Gatto did not conclude that plaintiff was able to perform all the material duties of her occupation, but only that plaintiff could return to work in a "limited" capacity and would need to be able to lie down frequently. Moreover, Reliance approved plaintiff's claim after Dr. Gatto rendered this opinion, and did not base its subsequent termination of plaintiff's benefits on this statement. Accordingly, the statements from those physicians such as Dr. Swerdlow who treated plaintiff at the time her benefits were terminated by Reliance are far more probative of plaintiff's medical condition.

27

element of pain is an important factor to be considered in determining disability."

Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001) (emphasis

added); see also Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) ("[T]he subjective

evidence of appellant's pain, based on her own testimony and the medical reports of

examining physicians, is more than ample to establish her disability, if believed.")

(quoted in Krizek v. CIGNA Group Ins., 345 F.3d 91, 100-01 (2d Cir. 2003)).  Here, as

previously discussed, the Social Security administrative law judge expressly found that

plaintiff's subjective account of her pain was credible.  [AR0178]

Notwithstanding this evidence in the record regarding plaintiff's disability,

Reliance concluded that plaintiff was not disabled from sedentary work, relying heavily

on the conclusions of its internal claim reviewer, Dr. Hauptman, that plaintiff was able to

perform sedentary work.[17]  Dr. Hauptman did not examine plaintiff or contact her, nor

did he contact any of plaintiff's treating physicians.  And, Dr. Hauptman – whose

specialties are internal medicine and gastroenterology, both entirely inapplicable to

plaintiff's condition – appears to have spent fewer than five hours reviewing plaintiff's

medical information and preparing his report to Reliance.  [AR0020]  After purportedly

reviewing plaintiff's medical file, Dr. Hauptman based his erroneous determination that

plaintiff could perform sedentary work upon (1) the "minimal findings of the objective

studies (MRI and EMGs) that this patient has had," (2) the fact that "[n]umerous physical

---

[17] In fact, Dr. Hauptman concluded that plaintiff "can function at the sedentary
level with the proviso that she can have breaks as necessary to stand up and move
around."  [AR0018]  As further evidence of its abuse of discretion, Reliance did not
make any effort to determine whether plaintiff's regular occupation would allow her the
ability to take breaks as necessary, and, as previously discussed, plaintiff was
frequently required to spend long hours seated at her desk on the telephone or working
on the computer.

examinations from [plaintiff's] doctors revealed neurologic examinations with normal reflexes and normal motor examination of the lower extremities," (3) "the fact that when the patient first presented to Dr. Swerdlow on February 18, 2000 (approximately 13 months after the initial injury) the only medication that she was taking was Advil on an as needed basis," and (4) the fact that two doctors "observed that the patient was able to get on and off the examining table without any assistance." [AR0018-19] Review of his report, however, reveals that it suffers from bias in favor of Reliance and that Dr. Hauptman's conclusions completely ignore the opinions of plaintiff's physicians regarding the nature of her condition and extent of her disability.

Preliminarily, it should be noted that Dr. Hauptman has been heavily criticized by several courts as being biased in favor of Reliance. See Conrad v. Reliance Standard Life Ins. Co., 292 F. Supp. 2d 333, 238 (D. Mass 2003) ("the reports Dr. Hauptman generated betray a palpable bias in favor of rejecting the claim"); Smetana v. Reliance Standard Life Ins. Co., No. 01-CV-4339, 2003 U.S. Dist. LEXIS 19564, *22-24 (E.D. Pa. Sept. 30, 2003) ("Dr. Hauptman's paper review is troubling to this Court. Dr. Hauptman did not examine Plaintiff personally, [and] the Court finds it suspect that Defendant would have so easily accepted his report over the findings of Plaintiff's treating physicians, and Plaintiff's subjective complaints of pain. . . . The conclusion reached by Dr. Hauptman is in direct conflict with the opinions of the Plaintiff's physicians and carry some level of bias."); Bowman v. Reliance Standard Life Ins. Co., No. 02 C 6188, 2003 U.S. Dist. LEXIS 4398, *20 (N.D Ill. March 21, 2003) (noting that defendant's reliance on Dr. Hauptman was "less than convincing" and that Dr. Hauptman's "opinion evidence is unimpressive, and somewhat unsupported, as compared with the rest of the record").

29

All three of these courts found that Reliance had abused its discretion in denying disability benefits based on Dr. Hauptman's reports. As in Conrad, Dr. Hauptman's report in the instant case focused exclusively on information that was favorable to Reliance. "Repeatedly, Dr. Hauptman's conclusions select for emphasis just one or two elements of a medical report, while ignoring additional facts and important context." Conrad, 292 F. Supp. 2d at 238.

For example, Dr. Hauptman cited the fact that Dr. Swerdlow's report of plaintiff's initial consultation in February 2000 indicated she took Advil for pain. [AR0015] Dr. Hauptman stated that "this argues significantly against significant disabling back pain" and erroneously suggested that it was inconsistent with the statement in plaintiff's affidavit, dated November 2000, that she takes pain medication which makes her drowsy. [AR0015] In his conclusion, Dr. Hauptman cited the fact that plaintiff was allegedly not taking prescription pain medication to support his finding that plaintiff was not disabled: "[p]atients with severe lower back pain that would disable them from a sedentary occupation routinely require significant pain medication for control of their symptoms." [AR0019] While Dr. Hauptman's report did note that Dr. Swerdlow prescribed plaintiff with Ultram, an opiate pain reliever, in March 2000, [AR0016], that fact is inexplicably ignored by Dr. Hauptman in his conclusion. In addition, as Dr. Hauptman noted in his summary but again ignored when reaching his conclusion, plaintiff was prescribed Celebrex (an anti-inflammatory), Flexeril (a muscle relaxant), Ambien (a sedative) and Valium (a muscle relaxant). [AR0016] Finally, Dr. Hauptman also appears to have ignored entirely the evidence in the record that plaintiff had been prescribed extensive pain medication including Hydrocodone and Vicodin since at least

April 1999. [AR0169-70, AR0439, AR0605, AR0424] Thus, Dr. Swerdlow's letter
provides no support for the conclusion that plaintiff's condition was not severe, as she
had previously been and was subsequently prescribed extensive prescription pain
medication, which is indicative of disabling back pain.[18]

Similarly, Dr. Hauptman's statements that plaintiff was able to get on and off the
examining table without assistance and that "[t]he physical therapy notes indicated that
the patient was walking and going to the gym," [AR0019], "leaves the impression of an
examiner who has embarked on his investigation determined to find evidence that [the
plaintiff] is not in as much pain, either physically or mentally, as [she] claims to be."
Conrad, 292 F. Supp. 2d at 240. As noted in the physical therapy reports and by
plaintiff in her affidavit, plaintiff attempted to walk nine blocks to the gym where her
physical therapy was held, but usually had to take a taxi or the bus due to her pain.
[AR0181-84] She also received treatment for pain when she was there, and frequently
experienced pain and numbness during her physical therapy.[19] [AR0424-26] Moreover,
Dr. Hauptman made no effort to explain how these facts in any way rebutted the
evidence in the record that plaintiff was unable to sit or stand for any lengthy period of

---

[18] As clarified in the Shore Decl., the reference to Advil was plainly taken out of
context. See Shore Decl. ¶¶ 19-25. Reviewing the letter, it is clear that Dr. Swerdlow's
reference to Advil related to plaintiff's complaints of wrist pain, for which she was also
referred to him, and which plaintiff had been able to control with Advil. [AR0106]; see
also Shore Decl. ¶ 21 At the time plaintiff first saw Dr. Swerdlow, she was taking
Celebrex, Flexeril, Valium, Vicodin and Hydrocodone for pain. See Shore Decl. ¶ 23;
[AR0169-70]. Because that treatment was inadequate, Dr. Swerdlow prescribed a trial
of Ultram, an opiate pain medication. [AR0102]; see also Shore Decl. ¶ 24. Thus, read
in its entirety, Dr. Swerdlow's letter provides no support for Dr. Hauptman's erroneous
conclusion that plaintiff's pain was manageable with Advil.

[19] Plaintiff's initial physical therapy consultation notes state "Activities: gym,
walk." As plaintiff explained in her declaration, plaintiff's physical therapist was located
in a gym. See Shore Decl. ¶ 18.

31

time without suffering severe pain and numbness. Similarly, Dr. Hauptman's statement

that some of plaintiff's physicians had found "normal reflexes and normal motor

examination of the lower extremities" – in other words, that plaintiff was able to lift her

legs during an examination – while ignoring the fact that others, including Dr. Gatto, Dr.

Swerdlow, and plaintiff's physical therapists, all found limited range of motion and pain

when plaintiff was examined, is further evidence of Dr. Hauptman's bias.

Finally, Dr. Hauptman's insistence that the MRI and EMG findings were "mild" or

"tiny" and his statement that "[t]hese minimal findings on MRI and EMG are not

consistent with incapacitating pain that would impair the patient to less than sedentary

work capacities" [AR0019], shows his "willingness to ignore factors favorable to the

claimant while taking negative factors out of context and emphasizing them." Conrad,

292 F. Supp. 2d at 238.[20] Dr. Hauptman's opinion also conflicts with those of plaintiff's

treating physicians, including Dr. Swerdlow, who opined that plaintiff's condition is

"characteristic of lumbar radiculopathy and the discogenic problem previously

documented on the MRI test." [AR0099]  In light of the palpable bias in Dr. Hauptman's

report and his lack of familiarity with plaintiff's condition, when contrasted with her

treating physicians, this Court should not credit his conclusions.

In ultimately denying plaintiff's claim, Reliance cited two facts: (1) its erroneous

view that plaintiff's pain is controlled with medication, and (2) the fact that two doctors

---

[20] Here, as in Conrad, Dr. Hauptman's report "uses bold face type . . . to give
prominence to his unfavorable interpretations, at the same time subordinating other of
the treating [physicians'] reported observations and conclusions." Conrad, 292 F. Supp.
2d at 238; see [AR0016] (using bold type to indicate that plaintiff's MRI testing showed
"mild" degenerative changes).  "The use of typographic emphasis suggests Dr.
Hauptman's approach was that of an advocate seeking to persuade, rather than a
medical professional seeking to evaluate." Conrad, 292 F. Supp. 2d at 238-39.

noted that plaintiff "was able to mount and dismount the examination table without any assistance." [AR0010] Neither of these facts in any way demonstrate that plaintiff is able to perform the material duties of her occupation, and Reliance's citation of them demonstrates that it abused its discretion by denying plaintiff's claim a "full and fair review."[21]

As previously discussed, Dr. Hauptman's conclusions regarding plaintiff's pain medication ignored the extensive evidence in the record of the actual medications that plaintiff was taking regularly for her condition. Despite evidence from plaintiff's treating physician and plaintiff's own testimony that her pain medication rendered her drowsy and unable to concentrate, neither Reliance nor Dr. Hauptman discussed the impact of plaintiff's medication on her ability to work. Reliance's baseless conclusion that plaintiff's pain is controlled with medication ignores the impact of such medication on plaintiff's ability to do her job, as well as the fact that even with medication, plaintiff could sit for at most one to two hours per day. Cf. Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F. Supp. 783, 791-82 (E.D.N.Y. 1994) (rejecting internal review where the physician reviewer failed to address the claimant's functional limitations).

Reliance's suggestion that the fact that plaintiff was able to mount and dismount the examination table without assistance meant that she was not disabled is even more egregious. Clearly, being able to get on and off of an examining table is in no way

---

[21] Under the Department of Labor regulations in effect at the time plaintiff's claim was denied, she was entitled to a "full and fair" review of her claim. See 29 C.F.R. § 2560.503.1(g)(1). Reliance already had more than ample opportunity to reconsider its erroneous termination of plaintiff's claim, and clearly failed to provide her with a full and fair review of her claim.

indicative of an ability to perform either the material duties of plaintiff's occupation or a sedentary occupation. See, e.g., Krizek, 345 F.3d at 100-01 (holding that it was an abuse of discretion to conclude that the plaintiff was not disabled because she volunteered with Special Olympics because "[t]here was no evidence showing that her duties with the Special Olympics were at all tantamount to 'performing all the essential duties of any occupation for which [plaintiff] is or may reasonably become qualified,' within the meaning of the Plan's definition of total disability. Nor was there any evidence that [plaintiff] was able to perform these duties without the aid of pain medication.").

In conclusion, Reliance's denial of plaintiff's claim not only ignored the unanimous opinions of her treating physicians, but it improperly focused on selective material from the record, which it took out of context. Reliance further abused its discretion by failing to consider the nature of the obligations of plaintiff's regular occupation, and whether she was actually able to perform those duties in light of her severe limitations. As the medical evidence in the record at the time Reliance denied her appeal demonstrates unambiguously that plaintiff remained disabled under the Policy, plaintiff is entitled to summary judgment on her claim for benefits.

## C.    Plaintiff is entitled to pre-judgment interest on her wrongfully withheld benefits

Plaintiff is also entitled to pre-judgment interest on her wrongfully withheld LTD benefits. The Second Circuit has held that pre-judgment interest may be awarded in such cases in the discretion of the district court. See, e.g., Jones v. UNUM Life Ins. Co., 223 F.3d 130, 139 (2d Cir. 2000). "In exercising such discretion, the court is to take into consideration '(i) the need to fully compensate the wronged party for actual

damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" Id. (quoting SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)).

Pre-judgment interest is appropriate here because plaintiff was wrongfully deprived of her long-term disability benefits, a source of income specifically designed to provide financial support in the event of disability, because of Reliance's improper and biased claims handling. While plaintiff's condition had not improved between August 1999, when her benefits were approved, and June 2000, Reliance terminated her benefits, basing its determination on an erroneous job description. Then, despite the submission by plaintiff of a detailed summary of the demands of her regular occupation and updated medical information, Reliance willfully disregarded the nature of plaintiff's occupation and disability. Instead, relying on a biased doctor, it focused exclusively on those few details in the record that it believed supported its determination, while ignoring the nature of plaintiff's regular occupation, the unanimous opinions of her treating physicians, and plaintiff's own detailed account of her disability. As the foregoing discussion makes clear, Reliance had no good faith basis for terminating plaintiff's benefits in June 2000, and it had absolutely no basis for withholding plaintiff's benefits after November 2000 when plaintiff submitted her appeal.

An award of pre-judgment interest is particularly appropriate here because the Supreme Court has held that ERISA does not permit the award of consequential or punitive damages for the wrongful denial of benefits. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985). Accordingly, pre-judgment interest is necessary to

compensate plaintiff for the time value of her LTD benefits which were wrongfully terminated by Reliance.  Nor, in the absence of an award of pre-judgment interest, will Reliance have any disincentive to engage in its improper practices in the future.  Cf. Dobson v. Hartford Fin. Servs., 196 F. Supp. 2d 152, 174 (D. Conn. 2002) (recognizing that requiring insurers to disgorge all profits made on wrongfully withheld long-term disability benefits deters improper claims handling in ERISA cases).

## VII.   CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment on her first, second and third claims for relief and dismissing defendants' affirmative defenses should be granted in all respects, together such other and further relief as to this Court may seem just and proper.

Respectfully submitted,

Dated:   New York, New York
         January 11, 2005

Rosen Preminger & Bloom LLP
Attorneys for Plaintiff

By:_____s/_____
    David S. Preminger (DP 1057)
    708 Third Avenue, Suite 1600
    New York, New York 10017
    (212) 682-1900