UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VALERIE A. SHORE,

                 Plaintiff,

    -v-

PAINEWEBBER LONG TERM DISABILITY
PLAN, RELIANCE STANDARD LIFE
INSURANCE COMPANY, PAINEWEBBER, INC.
as Administrator of the PAINEWEBBER LONG-
TERM DISABILITY PLAN, and UBS
PAINEWEBBER, INC. as Administrator of the
PAINEWEBBER LONG-TERM DISABILITY
PLAN,

                 Defendants.

---

Case No. 04-CV-4152 (KMK)

OPINION AND ORDER

Appearances:

David Steven Preminger, Esq.
Rose Ann Saxe, Esq.
Rosen Preminger & Bloom LLP
New York, N.Y.
*Counsel for Plaintiff*

Joshua Bachrach, Esq.
Rawle & Henderson, LLP
Philadelphia, PA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

       Valerie Shore, Plaintiff, sues PaineWebber Long Term Disability Plan (the "Plan"),

Reliance Standard Life Insurance Company ("Reliance") as Plan fiduciary, and PaineWebber

Group Inc. and UBS Financial Services Inc. as Plan Administrators (collectively "Defendants"),

alleging that Defendants wrongfully denied Plaintiff long term disability benefits in violation of

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1140 *et seq.*

(1994).

Plaintiff moves pursuant to Fed. R. Civ. P. 56 for summary judgment on her claims and dismissing Defendants' affirmative defenses.  Defendants move for summary judgment dismissing the complaint or, alternatively, remanding to Reliance for a determination as to whether Plaintiff is disabled from any occupation.  For the reasons stated herein, both motions are denied, but Plaintiff's benefits claim is remanded for further consideration by Reliance.

## I.  Background

### A.  Plaintiff's Injury and Medical Condition

The following facts are undisputed, except where noted.  Plaintiff began working for Correspondent Services Corporation, a subsidiary of PaineWebber, Inc., in 1997.  She held the title of Ethics Officer/Director of Continuing Education and had an annual salary of $75,000 with a guaranteed minimum annual bonus of $50,000.  (Pl.'s Local Rule 56.1 Statement ¶ 1; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 1-6.)  As an employee of PaineWebber, Plaintiff was a participant in the Plan,[1] which was insured under a group insurance policy ("the Policy") issued by Reliance.  (Pl.'s Local Rule 56.1 Statement ¶ 2; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 1-6 .)

As an Ethics Officer/Director of Continuing Education, Plaintiff provided continuing education for firms that worked with PaineWebber and assisted those firms with audits by the Securities Exchange Commission ("SEC") or the National Association of Securities Dealers ("NASD").  Plaintiff's pre-injury duties included regularly attending seminars and finance

---

[1]UBS Financial Services, Inc. has since acquired PaineWebber, Inc.  The Plan is now called the UBS Financial Services Inc. Long Term Disability Plan.

industry events and hosting conferences, lunches, dinners and weekly telecasts for clients. (Pl.'s Local Rule 56.1 Statement ¶ 3-4; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 1-6.) These seminars, conferences, and business meetings occurred both in- and out-of-state. (Pl.'s Local Rule 56.1 Statement ¶ 8-10; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 8-12.) Plaintiff managed a national marketing support center for different investment products and coordinated the printing of sensitive materials. In addition to editing those materials, Plaintiff lifted, carried, and unpacked heavy boxes containing printed material. (Pl.'s Local Rule 56.1 Statement ¶ 5-6; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 1-6.) Plaintiff worked – at a minimum – from 8:00 am to 6:00 pm, principally by computer and telephone. (Pl.'s Local Rule 56.1 Statement ¶ 8, 11; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 8-12.) Plaintiff traveled by subway, bus, ferry, or taxi to get to work and client meetings throughout the day. Plaintiff also drove long distances or traveled by train or airplane in order to attend client meetings, seminars, and conferences. (Pl.'s Local Rule 56.1 Statement ¶ 12; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 8-12.)

On January 15, 1999, Plaintiff injured her back at work while lifting boxes. (Pl.'s Local Rule 56.1 Statement ¶ 13; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 13.) Plaintiff was diagnosed with a herniated disc, degenerative disc disease, lumbar radiculopathy[2], and osteoarthritis. (Pl.'s Local Rule 56.1 Statement ¶ 14; Defs.' Resp. to Pl.'s Local Rule 56.1

---

[2] "Lumbar refers to the low back region. . . . Nerve roots branch out from the spinal cord and carry messages to and from the brain and the lower extremities and pelvis. If one of these roots is sick or injured in the area where it leaves the spine, it is called radiculopathy. . . . Many disease states can cause lumbar radiculopathy, but most often it is a structural problem like a herniated disc, bone spur, or mechanical stretching or traumatic event." Am. Assoc. of Neuromuscular & Electrodiagnostic Med., http://www.aanem.org/education/patientinfo/ lumbar_radiculopathy.cfm (last visited October 11, 2007).

Statement ¶ 14.)  Defendants concede that Plaintiff was disabled from January 19, 1999 to June

19, 2000, the date on which benefits were discontinued.  Plaintiff asserts that she remains

disabled and unable to return to work because of the effects of her injury.  (Pl.'s Local Rule 56.1

Statement ¶ 14.)  Defendants disagree.  (Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 14.)

        Since her injury, Plaintiff has been treated by an orthopedic surgeon, two spinal surgeons,

a rheumatologist, a urologist, and a physical therapist.  (Pl.'s Local Rule 56.1 Statement ¶ 18;

Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 18.)  Plaintiff has been prescribed pain

medication, anti-inflammatories, and muscle relaxants, including Celebrex, Naprosyn, Valium,

Flexeril, Ambien, Vicodin, and Hydrocodone.  (Pl.'s Local Rule 56.1 Statement ¶ 22; Defs.'

Resp. to Pl.'s Local Rule 56.1 Statement ¶ 22.)  Plaintiff asserts that these medications make her

drowsy and interfere with her ability to concentrate.  (Pl.'s Local Rule 56.1 Statement ¶ 23.)

        Plaintiff reports that her symptoms of pain are exacerbated by sitting or standing for more

than 30-40 minutes at a time, requiring her to change her position frequently.  (Pl.'s Local Rule

56.1 Statement ¶ 20; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 20.)  Additionally, she

states that she cannot walk for more than a short distance and spends much of the day lying

down to relieve the pain.  (Pl.'s Local Rule 56.1 Statement ¶ 21; Defs.' Resp. to Pl.'s Local Rule

56.1 Statement ¶ 21.)

        In June 1999, Plaintiff applied for long term disability ("LTD") benefits under the Plan.

(Pl.'s Local Rule 56.1 Statement ¶ 24; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 24.)  In

her disability claim, Plaintiff stated that she was unable to work because she was sleepy, was

unable to think clearly while on medication, experienced pain while sitting, walking or standing,

had nerve pain in her foot, buttock and pelvic areas, and had urinary problems.  (Administrative

Record at 273 (hereinafter "AR").)  Plaintiff's claim was granted by Reliance on August 18,

1999.  (AR 214-15.)

After her application for benefits was granted, Plaintiff provided information from her

various treating physicians to Reliance.  (Pl.'s Local Rule 56.1 Statement ¶ 29; Defs.' Resp. to

Pl.'s Local Rule 56.1 Statement ¶ 29.)  One piece of information provided was a February 9,

1999 MRI read by Dr. Sharon Lichtblau, who found there was "a small left-sided prolapse of the

L4-L5 intervertebral disc extending into the left lateral recess. . . . At L5-S1, there is a minimal

posterior bulge on the left side. . . . The remaining discs appear normal."  (AR 501.)  Defendants

also received a March 26, 1999 certificate of disability form, completed by Dr. Charles Gatto,

which concluded that Plaintiff could not do her usual work and would need frequent breaks for

changes of position.  (AR 484-85.)  Plaintiff also provided the results of her April 8, 1999 EMG

nerve conduction test, which showed an absence of right peroneal nerve wave and mild

neuropathic dysfunction in the muscle consistent with a mild right-sided dysfunction in the L5

disc.  (AR 404.)  Dr. Gatto subsequently diagnosed Plaintiff with a joint inflammation and

possible intermittent bilateral lower extremity radiculopathy.  (AR 402.)  Dr. Gatto also

confirmed the findings of the February 9, 1999 MRI.  (*Id*.)  Dr. Gatto opined that Plaintiff should

be able to return to work in some limited capacity but that she would need to have light duty

work and be permitted to change positions and lie down during the day, perhaps even at one-

hour intervals.  (AR 403.)  Dr. Gatto further stated that Plaintiff's pain might preclude her from

driving in a car or flying in an airplane for any length of time, but Dr. Gatto also noted that he

otherwise found Plaintiff's "upper extremities and [her] attention and cognitive abilities to be

grossly normal."  (*Id*.)

Plaintiff also provided Reliance with an April 29, 1999 assessment by Dr. William Main, who noted that Plaintiff suffered from primarily mechanical back pain related to a disc injury suffered at work. He recommended "a prolonged course of physical therapy and other conservative measures prior to considering anymore [sic] invasive treatment." (AR 439-40.) At Plaintiff's initial physical therapy session following this recommendation, the therapist noted that Plaintiff was taking Naproxen, Flexeril and Hydrocodone for pain. (AR 424.) At a subsequent physical therapy session on May 5, 1999, the therapist noted that Plaintiff suffered acute pain from sitting for five minutes during the therapy session. (AR 424-25.)

On July 28, 1999, Dr. Main diagnosed Plaintiff with a lumbar herniated disc at L4-L5, which resulted in symptoms of low back pain radiating down her left leg and which stemmed from her January 15, 1999 work-related incident. (Defs.' Local Rule 56.1 Statement ¶ 12-13; Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ¶ 12-13.) Plaintiff provided Reliance with this diagnosis. Dr. Main referred Plaintiff to physical therapy, acupuncture, and a physciatrist for medical rehabilitation. He did not, however, refer Plaintiff for surgery in the near future. (AR 505-06, 431.) Dr. Main further reported that, in an 8-hour work day with two breaks and lunch, the Plaintiff could stand and sit for one to three hours but could not walk, drive, push or pull. (AR 506.) Dr. Main reported that Plaintiff could occasionally bend, squat, climb, reach above her shoulder, kneel, crawl, use her feet, and lift 10 pounds. (*Id*.) He further reported that Plaintiff was extremely limited in her ability to perform simple and repetitive tasks, as well as in her ability to perform complex and varied tasks. (*Id*.) Dr. Main concluded that Plaintiff would reach maximum medical improvement in three to four months and that her condition should be reviewed at that time. (*Id*.)

On August 5, 1999, Dr. Fred Hochberg examined Plaintiff and noted that she did not suffer from any gross motor or sensory deficit, but he concluded that she was still partially disabled. Dr. Hochberg recommended additional physical therapy three times per week for six to eight weeks. (AR 477-78.) Plaintiff provided Reliance with this diagnosis and recommendation. Plaintiff also provided Reliance with an August 17, 1999 report from Dr. Main in which he recommended that Plaintiff seek immediate medical testing and treatment for her urinary complaints. (AR 360-61.) Plaintiff's claim for benefits was approved the next day, on August 18, 1999. (AR 214-15.)

Shortly after Reliance approved Plaintiff's claim for benefits, she was interviewed, at Reliance's request, by a rehabilitation consultant in order to assess her chances of vocational rehabilitation. The consultant concluded that Plaintiff was "not voicing nor demonstrating motivational behaviors to return to work in the near future and under her current circumstances." (AR 332.)

On October 13, 1999, at Reliance's request, Plaintiff attended an independent medical examination with Dr. Adler. (AR 394.) In preparation, Dr. Adler reviewed records from Dr. Hochberg, Dr. Main, Dr. Lichtblau, and Dr. Gatto, but he did not have – and therefore did not review – any MRI pictures or x-rays of Plaintiff. (AR 384.) Dr. Adler opined that Plaintiff had a moderate, partial disability that would benefit from an active physical therapy program. Dr. Adler diagnosed Plaintiff with a degenerative disc disease and mechanical low back pain. (AR 385-86.) He concluded that Plaintiff was capable of sedentary desk work and could return to work if the bladder urodynamic studies did not suggest a spinal pathology. (AR 387-88.)

The results of Plaintiff's subsequent urodynamic testing showed few abnormalities. Dr.

Jonathan Vapnek noted that "[t]he elevation in urethral sphincter pressures is commonly seen in those with back problems as well as those who simply have tight pelvic floors." (AR 365.) Dr. Vapnek stated that it might be "instructive to repeat the study when the patient is symptomatic." (*Id.*)

On June 19, 2000, Reliance informed Plaintiff via letter that she no longer qualified as disabled and that her claim for further LTD benefits was denied as of June 19, 2000. (AR 267-68.) Reliance stated that it had reviewed medical documents from Dr. Main, Dr. Lichtblau, Dr. Gatto, and Dr. Adler. Based on the facts that the urodynamic testing revealed few abnormalities and that the elevated pressure levels were common among both people with low back pain and those with tight pelvic floors, Reliance concluded that Plaintiff could return to her former position, which was characterized as sedentary. (AR 266-68.)

On November 20, 2000, Plaintiff's former counsel appealed Reliance's termination of Plaintiff's benefits. In pursuit of this appeal, Plaintiff provided additional information to Reliance, including a summary of material job duties she had prepared. (AR 91.) She also provided a November 20, 2000 Affidavit recounting her symptoms. (AR 181-84.)

In addition to providing duplicates of information provided at the initial stage, Plaintiff also provided Defendants with new information, including a February 18, 1999 examination report from Dr. Gatto, in which he determined that Plaintiff had degenerative disc disease with back pain and possible bilateral sensory radiculopathy. Dr. Gatto also found joint inflammation, which was greater on the left than on the right. (AR 122-23.) Dr. Gatto recommended an EMG nerve conduction study, joint injection and physical therapy.

On March 4, 1999, Dr. Gatto noted that Plaintiff had not had any of the treatments

recommended on February 18, 1999.  He stated that Plaintiff had informed him that her worker's

compensation insurance had denied coverage of those treatments.  Plaintiff, however, also

informed Dr. Gatto that she would proceed with the treatments by paying out-of-pocket or

seeking reimbursement from her regular insurance.  (AR 124.)

Plaintiff also provided Reliance with an October 5, 1999 report from Dr. Samir Dutta,

which stated, among other things, that Plaintiff's conditions "are chronic in nature, and not likely

to improve completely," and that Plaintiff can "sit for one to two hours, stand for one to two

hours, walk for eight to ten blocks, and can carry about 10-15 lbs."  (AR 115.)  The next day, an

interpretation of a radiographic examination of Plaintiff's spine found that the disc spaces were

relatively well-maintained.  (AR 116.)

On March 4, 2000, Dr. Swerdlow diagnosed Plaintiff with degenerative disc disease,

lumbar radiculopathy, osteoarthritis, and possible carpal tunnel syndrome.  (AR 107.)  Plaintiff

provided this report to Reliance.

Plaintiff further provided a July 7, 2000 follow-up examination report from Dr. Vapnek.

Dr. Vapnek opined that Plaintiff's urinary symptoms were likely associated with other

neurological symptoms related to her back injury and suggested that testing while she was

symptomatic would be instructive.  (AR 168.)  Shortly thereafter, on July 24, 2000, Dr.

Swerdlow noted that the medications Plaintiff uses interfere with her ability to concentrate.  (AR

99.)  A July 26, 2000 MRI revealed a "tiny" disc herniation at L5-S1 and a disc herniation at L4-

L5.  (AR 104.)

On November 14, 2000, Dr. Frederick Swerdlow stated that Plaintiff was under his

ongoing care.  Dr. Swerdlow noted that Plaintiff has difficulty standing and sitting for short

periods of time, which would make working at a sedentary job impossible.  (AR 92-93.)

Plaintiff provided this report to Reliance.

Plaintiff also provided an April 28, 2000 decision by an Administrative Law Judge

("ALJ") for the Social Security Administration, finding that Plaintiff was disabled as of January

15, 1999, and a January 17, 2001 decision from the New York State Workers' Compensation

Board, finding that Plaintiff is permanently disabled and entitled to worker's compensation.  (AR

24-25, 179.)  The ALJ specifically found that Plaintiff could "no longer work" at the "exertional

level" required by her previous occupation.  (AR 178.)

Reliance engaged Dr. William Hauptman to conduct a review of Plaintiff's claims.  Dr.

Hauptman is board certified in internal medicine, gastroenterology, and quality assurance and

utilization review.[3]  (AR 12.)  In his five-hour review of Plaintiff's claims, Dr. Hauptman did not

examine Plaintiff or contact any of Plaintiff's treating physicians.  In his report, Dr. Hauptman

identified what he believed were relevant portions of the medical records he reviewed.  He

concluded that Plaintiff could perform a sedentary occupation if allowed to take breaks as

needed.  (AR 19.)  Dr. Hauptman based his conclusion on several factors, including the mild

findings on the MRI and EMG, her normal reflex and motor examinations, the fact that she was

not taking prescription pain medicine (but only Advil), and the fact that two doctors noted she

was able to get on and off the examining table without assistance.  (*Id*.)

B.  The Plan

The Policy governing Plaintiff's benefits defines "Totally Disabled" and "Total

---

[3]Dr. Hauptman billed Reliance for the 4.75 hours spent reviewing Plaintiff's file.  (AR
20.)

Disability" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness: (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
>> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
>>
>> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered "Total Disability"; and
>
> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

(Pl.'s Local Rule 56.1 Statement ¶ 27; Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ¶ 27.)

### C.  Material Duties of Plaintiff's Regular Occupation

To be clear, it was Plaintiff's LTD benefits claim during the "Elimination Period" that Defendants denied and which is the subject of this case.  As part of the review of the denial of benefits, Plaintiff submitted to Reliance a description of her duties in her position at PaineWebber.  According to Plaintiff, these duties included, among other things, attending daily, weekly, and monthly meetings, client visits, conferences, and seminars in- and out-of-state, which often included sitting or standing for the entire day, traveling to and from those events, daily computer work, carrying large amounts of documents to events, working at home on the computer or telephone after hours, personally receiving and unpacking sensitive materials, and conducting day-long tours of the SEC and NASD.

Defendants relied upon the Department of Labor's Dictionary of Occupational Titles

("DOT") in determining the duties of Plaintiff's occupation. Defendants categorized Plaintiff as

a Director of Educational Programs, which in 1999 included tasks such as cooperating with

businesses to develop curriculums, interviewing staff members, preparing budgets, and analyzing

data from questionnaires all in connection with an educational institution. The occupation is

designated as sedentary. (AR 341-42.)

<u>I. Discussion</u>

<u>A. Standard of Review</u>

<u>1. Summary Judgment</u>

Summary judgment may be granted where it is shown that there is "no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must

view all evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85

(2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no

genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*see also Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party

has made a properly supported showing sufficient to suggest the absence of any genuine issue as

to a material fact, the nonmoving party, in order to defeat summary judgment, must come

forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga*

*v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not

be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*,

923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d

12

211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Castro v. Metro. Transp. Auth.*, No. 04 CV 1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).

## 2. ERISA

"A denial of benefits under ERISA is reviewed by the District Court 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 123-24 (2d Cir. 2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 115 (1989)). In such a case, the *de novo* standard "applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator." *Muller*, 342 F.3d at 124.

However, "[w]hen an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits challenged under § 502(a)(1)(B)." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995); *see also Firestone*, 489 U.S. at 115. "The plan administrator bears the burden of proving that the deferential standard of review applies." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002). Under this standard, a court may not "substitute [its] own judgment for that of the plan administrator as if [it] were considering the issue of eligibility anew." *Celardo v.*

*GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003). Instead, "[t]he court may reverse only if the fiduciary's decision was arbitrary and capricious, that is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller*, 72 F.3d at 1070 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)) (internal quotation marks omitted). Substantial evidence "'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance.'" *Miller*, 72 F.3d at 1072 (quoting *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)) (alterations in original). In conducting its review, the Court may only consider the administrative record. *Id.* at 1071.

A plan administrator's determinations may be deemed arbitrary and capricious where the administrator "impose[s] a standard not required by the plan's provisions, or interpret[s] the plan in a manner inconsistent with its plain words, or by [its] interpretation render[s] some provisions of the plan superfluous." *Gallo v. Madera*, 136 F.3d 326, 330-31 (2d Cir. 1998). But, if the plan administrator and the beneficiary "offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control." *Celardo* 318 F.3d at 146.

The Parties' cross summary judgment motions raise three questions: 1) Did Defendants properly categorize Plaintiff's regular occupation as sedentary?;  2) Even if Plaintiff's regular occupation is properly categorized as sedentary, did Defendants arbitrarily and capriciously conclude that Plaintiff could perform a sedentary job?;  and 3) If Defendants improperly terminated Plaintiff's benefits, is she entitled to pre-judgment interest on those benefits?  Before reaching these questions, the Court must address Defendants' claim that Plaintiff's action is

time-barred.

<u>B.  The Statute of Limitations</u>

Plaintiff brings her claims under Section 502(a)(1)(B) of ERISA, codified as 29 U.S.C. § 1132(a)(1)(B).  ERISA does not establish a statute of limitations period for benefits claims brought under those provisions.  *See Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, 43 F. Supp. 2d 303, 306 (E.D.N.Y. 1999).  Courts apply the most analogous state statute of limitations.  *See Miles v. N.Y. State Teamsters Conference Pension and Ret. Fund*, 698 F.2d 593, 598 (2d Cir.1983), *abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), *as recognized in de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1185 (4th Cir. 1989); *Lowry v. Aetna Life Ins. Co.*, No. 96 CV 0856, 1996 WL 529211, at *2 (S.D.N.Y. Sept. 18, 1996).  In New York, that statute is the six-year limitation on contract actions.  *See Miles*, 698 F.2d at 598 (citing N.Y. C.P.L.R. § 213).  Under New York law, however, a shorter limitations period will govern where "prescribed by written agreement."  N.Y. C.P.L.R. § 201.  "[W]ritten agreement" includes employee welfare benefit plans governed by ERISA.  *See Mitchell v. Shearson Lehman Bros., Inc*., No. 97 CV 0526, 1997 WL 277381, at *2 (S.D.N.Y. May 27, 1997); *Lowry*, 1996 WL 529211, at *2; *Lugo v. AIG Life Ins. Co.*, 852 F. Supp. 187, 195 (S.D.N.Y. 1994); *Moro v. Welfare Plan of NMU Pension and Welfare Plan*, No. 84 CV 9275, 1985 WL 1896, at *2-3 (S.D.N.Y. July 11, 1985).  Under New York law, a claim for benefits accrues "when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries."  *Miles*, 698 F.2d at 598 (internal quotation marks omitted).

In the "Claims Provisions" section of the Plan, there is a limitation on actions provision, which states:  "No legal action may be brought against us to recover on this Policy within sixty

(60) days after written proof of loss has been given as required by this policy.  No action may be brought after three (3) years (Kansas, five (5) years; South Carolina, six (6) years) from the time written proof of loss is received."  (AR 71.)  Plaintiff argues that this limitation does not apply to her claims because the Summary Plan Description ("SPD") she received does not mention any limitation on actions, and she never received a copy of the complete Plan.

Under ERISA, employers are required to distribute to their employees SPDs describing a plan's benefits.  29 U.S.C. §§ 1022(a) & 1024(b); *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003).  As an employee's primary source of information concerning employment benefits, the SPD must be clear, accurate, comprehensive, and not misleading.  *See* 29 U.S.C. § 1022(a); *Burke*, 336 F.3d at 110; *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2d Cir. 1990) ("It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complicated document, and then proclaim that any inconsistencies will be governed by the plan.  Unfairness will flow to the employee for reasonably relying on the summary booklet." (quoting *McKnight v. S. Life and Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir. 1985))).  As the Second Circuit has observed, "[t]he consequences of an inaccurate SPD must be placed on the employer.  The individual employee is powerless to affect the drafting and less equipped to absorb the financial hardship of the employer's errors."  *Burke*, 336 F.3d at 113.  "Significantly, the SPD must contain the plan's eligibility requirements for benefits as well as 'the circumstances which may result in disqualification, ineligibility or denial or loss of benefits.'"  *Id.* at 110 (quoting 29 U.S.C. § 1022(b)); *see also Manginaro v. Welfare Fund of Local 771*, 21 F. Supp. 2d 284, 293 (S.D.N.Y. 1998).  To that end, "courts have recognized that where the SPD does not contain a benefit

16

forfeiture clause, then such a forfeiture contained in the underlying plan will not be enforced against a participant." *James v. N.Y. City Dist. Council of Carpenters Benefits Funds*, 947 F. Supp. 622, 628 (E.D.N.Y. 1996) (internal quotation marks omitted); *see also Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297, 303 (W.D.N.Y. 2004) (recognizing that not every omission of information in the plan from a SPD constitutes a conflict, but that omission of information that results in a significant reduction in plaintiff's benefits does constitute a conflict). Moreover, the plan administrator must "make reasonable efforts to ensure each plan participant's actual receipt of the plan documents." *Weinreb v. Hosp. for Joint Disease Orthopaedic Inst.*, 404 F.3d 167, 170 (2d Cir. 2005) (internal quotation marks omitted).

The Plan here contained the three-year limitation on actions provision set forth above, (Defs.' Mot. for Summ. J. at 4.), and Defendants concede that the SPD does not mention any such limitation, (Defs.' Resp. at 3.). Defendants, however, argue that the limitation on actions need not be included in the SPD because, under ERISA, only circumstances that may result in a denial or loss of benefits must be included in the SPD. According to Defendants, a contractual limitation on actions is not a circumstance resulting in "disqualification, ineligibility or denial of benefits," and, therefore, need not be included in the SPD. This argument is not convincing.

In *Manginaro*, the court characterized the limitation on actions provision as a "benefit forfeiture clause" that will not be enforced against a plan participant if it is not included in the SPD. 21 F. Supp. 2d at 293. Judge Mukasey explicitly stated that a two-year limitation on actions provision, which shortens the generally applicable statute of limitations by four years, "qualifies as a 'circumstance[] which may result in disqualification, ineligibility, or denial or loss of benefits' that should have been disclosed to plaintiff[] via the SPD." *See id.* (first alteration in

original). [4]

In addition to making unpersuasive attempts at distinguishing *Manginaro*, discussed below, Defendants argue that this Court should not follow *Manginaro's* reasoning or holding. *Manginaro*, however, is not alone in the woods, as other courts have followed it to reject the precise argument being made by Defendants here. In *Magin v. Cellco P'ship*, No. 05 CV 1573, 2007 WL 625979, at *4 (N.D.N.Y. Feb. 23, 2007), the court held that "the fact that the terms of the managed disability plan itself may impose a one-year limitations period does not assist defendants, where, as here, the limitations period was not disclosed in the applicable summary plan description." And, in *Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, No. 97 CV 6612, 2005 WL 3775953, at *4-5 (E.D.N.Y. Dec. 24, 2005), the court held, relying principally in *Manginaro*, that the absence of any notice of a plan's limitations period justified denial of summary judgment for defendant.

Ultimately fatal to Defendants' position, however, is the favorable treatment *Manginaro* has received in the Second Circuit. In *Burke*, discussed more fully below, the Second Circuit held that a plan beneficiary must demonstrate harm as a result of a deficient SPD, and once an ERISA plaintiff has made that initial showing, the employer may rebut it by demonstrating that

---

[4]In support of his holding, Judge Mukasey cited the Eighth Circuit's decision in *Dodson v. Woodmen of the World Life Ins. Soc'y*, 109 F.3d 436 (8th Cir. 1997). In *Dodson*, the court held that plaintiff's failure to file a timely claim for benefits was excusable because the SPD did not clearly notify beneficiaries of the time limitation. *Id.* at 439. Defendants attempt to distinguish *Dodson* on the basis that it involves a time limitation on filing a claim with the plan administrator, not a lawsuit in court. That distinction is irrelevant. The requirement in 29 U.S.C. § 1022(b) that circumstances which could result in a loss of benefits be disclosed in the SPD does not distinguish between the methods by which those benefits are lost. Whether a participant would suffer a forfeiture of benefits because of contractual time limits for filing a claim or a lawsuit, it is a forfeiture nonetheless, and it will not be enforced unless it is disclosed in the SPD. *See Manginaro*, 21 F. Supp. 2d at 294.

the deficiency constituted harmless error.  336 F.3d at 113.  Right after stating this holding, the court went on to note that the "facts of [*Manginaro*] provide a useful illustration."  *Id.*  Then, the court commented that the "district court [in *Manginaro*] ruled, in accordance with Second Circuit precedent, that because the plan and the SPD were in conflict, the SPD controlled."  *Id.*  While this description of *Manginaro* is not the same as an affirmance, it is a sufficiently warm enough embrace of Judge Mukasey's holding in *Manginaro* to thwart Defendant's attempt to dissuade this Court from following it.[5]

However, just because the SPD was deficient under ERISA does not mean that Plaintiff may automatically disregard the three-year limitation in the Plan.  "In order to take advantage of a deficient SPD, an employee suing under ERISA must show prejudice resulting from the deficiency."  *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 261 (S.D.N.Y. 2005).  In order to show prejudice, the plan participant must show that he or she was "*likely* to have been harmed as a result of a deficient SPD."  *See Burke*, 336 F.3d at 113.  In other words, "likely prejudice to a plaintiff will be presumed if, as the result of an SPD deficiency, he was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action."  *Sheehan*, 368 F. Supp. 2d at 262.  The employer may rebut the participant's initial showing "through evidence that the deficient SPD was in effect harmless error."  *See Burke*, 336

---

[5]The case Defendants cite in support of their argument – *Patterson-Priori v. Unum Life Ins. Co. of Am.*, 846 F. Supp. 1102 (E.D.N.Y. 1994) – is distinguishable.  In that case, there was no dispute about whether the SPD disclosed the limitation on actions.  Instead, the court only addressed the question of whether a participant's request for review of a final claim re-starts the clock for time limitation purposes.  The court held that it did not, but that holding does not address the question of whether limitation on actions provisions must be included in SPDs to be enforceable against participants.

F.3d at 113.

Plaintiff here claims that she likely was prejudiced by the omission of the three-year limitation in the SPD because, had she known about the limitation, she probably would have filed her lawsuit earlier.  (Pl.'s Mot. for Summ. J. at 21-22.)  Defendants denied Plaintiff's appeal for benefits on February 16, 2001.  (Pl.'s Local Rule 56.1 Statement ¶54.)  Thereafter, her files were put into storage until March 2004.  (Pl.'s Local Rule 56.1 Statement ¶79.)  Before then, Plaintiff asserts that she never saw the Plan and that the versions of the Plan provided to her former counsel were outdated and/or inapplicable to her.  (Pl.'s Aff. ¶ 8.)  Plaintiff subsequently retrieved her file from her former counsel in March 2004 and contacted another attorney in April 2004.  (Pl.'s Aff. ¶ 12-13.)  It was at that time that she learned there may be a three-year limitation.  (Pl.'s Aff.¶ 13.)  Plaintiff filed this action on June 2, 2004, two months after learning of the possible time limit.  (Pl.'s Mot. for Summ. J. at 22; Def.'s Resp. at 2.)  Plaintiff asserts that she would have filed her lawsuit within the three-year period had she been aware of that limitation.  (Pl.'s Aff. ¶ 13.)

Plaintiff has demonstrated that she had the interest and ability to file this case earlier had she known about the three-year limitations provision in the Plan.  Given that Plaintiff obtained counsel to file the present action, she likely would have obtained counsel earlier if she had known about the Plan's limitations provision.  Thus, Plaintiff's actions and sworn statements are sufficient to show that she likely was prejudiced by the omission of the limitations provision from the SPD.  *See Medoy*, 2005 WL 3775953, at *5 (holding that omission of shorter statute of limitations provision likely prejudiced plaintiff); *Manginaro*, 21 F. Supp. 2d at 296 (holding that, because the two-year limitation was not adequately disclosed by the employer in the SPD,

plaintiff likely was prejudiced).

Defendants attempt to distinguish *Manginaro* on the grounds that, unlike in *Manginaro*, Plaintiff here had reason to know that a shorter limitation applied because the Plan was distributed to PaineWebber employees, including Ms. Shore. (Defs.' Mot. for Summ. J. at 7.) There are several problems with Defendants' argument. First, *Manginaro* held that, "[h]ad the Fund adequately disclosed the two-year limitation to its participants *via the SPD*, it is likely that [plaintiff] would have learned of this limitation from his employer, his co-workers, or the union, even if he never read the SPD himself" because his co-workers were likely to have learned of the provision *as explained in the SPD*. *See* 21 F. Supp. 2d at 296 (emphasis added). Here, as in *Manginaro*, the SPD did not discuss the limitations provision, and therefore, Plaintiff's co-workers would not have learned of it from the SPD. Second, Defendants offer nothing to support their bare assertion that the Plan was distributed to Plaintiff or that she knew about the time limit even if she never received the Plan. (Def.'s Mot. for Summ. J. at 7.) In fact, the Affidavit Defendants submitted from Leticia Waelz, a benefits department manager, asserted that the benefits department had possession of the Plan, it was available to all employees, and it was used in answering employees' questions. (Waelz Aff. ¶ 9-10.) Obviously, maintaining the Plan in the benefits department and making it available to employees are not the equivalent of actually distributing the Plan to employees and are exactly the sort of claims rejected by the court in *Manginaro*. Furthermore, there is no evidence that Plaintiff actually knew about the time limit even if she did not receive the Plan. *Cf. Weinreb*, 404 F.3d at 172 (finding that the plan participant had actual knowledge of the requirements in the plan, even though he never received the plan, because he received two written memoranda and a phone call requesting that

21

he complete the requisite enrollment form).  Indeed, Plaintiff states that she neither received the

plan nor had knowledge of the existence of the time limit.  Defendants do not offer any evidence

to rebut Plaintiff's sworn statement.  Accordingly, the six-year statute of limitations of N.Y.

C.P.L.R. § 213 applies to Plaintiff's LTD benefits claims.

C.  Plaintiff's "Regular Occupation"

The Parties agree that Reliance's denial of benefits to Plaintiff was an exercise of its

discretion under the Plan, which provides that Plaintiff is disabled during the Elimination Period

if, *inter alia*, as a result of an injury, she cannot "perform the material duties of . . . her regular

occupation."[6]

To determine if Reliance arbitrarily denied Plaintiff her benefits, a threshold question is

the meaning of "regular occupation" under the Plan.  Unfortunately, neither the Plan nor the SPD

provides a clear definition.  Nonetheless, Reliance, in denying Plaintiff her disability benefits,

concluded that "while we understand that [Plaintiff] claims that [her] *job* requires a great deal of

physical exertion, her *occupation* is classified as sedentary duty by the United States Department

of Labor's Dictionary of Occupational Titles ("DOT").  (AR 6 (emphasis in original).)  In

---

[6]Because Reliance terminated Plaintiff's LTD benefits before they had been paid for
twenty-four months, Plaintiff's entitlement to benefits is to be evaluated on her ability to
"perform the material duties of" her "regular occupation."  Plaintiff argues that this language
should be interpreted to mean that she is entitled to long-term benefits if she cannot perform
"each and every material duty" of her "regular occupation."  However, the case cited by Plaintiff
in support of this proposition involved a benefits plan that was worded differently than the Plan
here.  *See Lain v. Unum Life Ins. Co. of Am.*, 279 F.3d 337, 345 (5th Cir. 2002) (noting that the
policy defined "disability" and "disabled" to mean that "because of injury or sickness [the
insured] cannot perform *each* of the material duties of [her] regular occupation" (alterations in
original)).  Here, the Plan does not indicate how many "material duties" a claimant must be
unable to perform in order to receive benefits.  However, this ambiguity need not be resolved for
purposes of the pending motions.

22

reaching this conclusion, Reliance determined that Plaintiff's occupation, under the DOT, was

"Educational Program Director[]." According to Reliance, the DOT description for this

occupation is that it is sedentary and involves "lifting, carrying, pushing, pulling 10 lbs

occasionally," and that it requires "[m]ostly sitting," but might also require "standing or walking

for brief periods of time." (AR 342.)

Even deferring to Reliance's interpretation of the meaning of "regular occupation" in the

Plan, the Court finds that Reliance's determination was arbitrary. The phrase itself is not all that

ambiguous. *See Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385-86 (3d Cir. 2003)

("[W]e believe that 'regular occupation' is not ambiguous."). Indeed, the Second Circuit has

held that where a benefits plan does not define such a term, "'the applicable definition of regular

occupation shall be a position of the same general character as the insured's previous job,

requiring similar skills and training, and involving comparable duties.'" *Kinstler v. First

Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (quoting *Dawes v. First Unum

Life Ins. Co.*, 851 F. Supp. 118, 122 (S.D.N.Y. 1994)) (internal quotation marks omitted).

Therefore, Plaintiff's "regular occupation" was not the "standard set forth in [Reliance's] letter

denying [her] appeal, but the standard articulated by the Second Circuit in *Kinstler*." *See Peck v.

Aetna Life Ins. Co.*, 495 F. Supp. 271, 277 (D. Conn. 2007). To be sure, "[w]hile *Kinstler's*

definition of [regular] occupation is not limited to the participant's particular job, it does require

that the administrator take into account 'what sort of position is of the same general character as

the insured's previous job.'" *Id.* (quoting *Kinstler*, 181 F.3d at 252-53); *see also Lasser*, 344

F.3d at 386. Among other things, this requires plan administrators to give "some consideration

of the nature of the institution where [the participant] was employed." *Kinstler*, 181 F.3d at 253.

23

Reliance did not follow the clear guidance from the Second Circuit and instead categorized Plaintiff's occupation solely by focusing on her title. Seeing that Plaintiff's title included "Director of Continuing Education," Reliance consulted the DOT, found a description for "Educational Program Directors," and decided that that title fit Plaintiff's employment. However, the DOT description for "Educational Program Directors" notes that this occupation requires the employee to "[p]lan, develop and administer programs to provide educational opportunities for *students*." (AR 341 (emphasis added).) Indeed, as is plain from the DOT description, an Educational Program Director is an administrative position in an educational institution, and not a client-service position at a fast-paced, financial services company with clients and offices around the country.[7]

In reflexively using the DOT classification for "Educational Program Directors," Defendants clearly ignored the actual duties of Plaintiff's job and the institution where she was employed. Rather than merely developing curricula, preparing budgets, and analyzing data, Plaintiff was required to network and educate clients located around the country. In particular, the record reveals that Plaintiff worked as an Ethics Officer/Director of Continuing Education at a subsidiary of Paine Webber, a large financial institution, and that her responsibilities required her to work with various firms and assist them in dealing with audits by the SEC and the NASD. In this occupation, Plaintiff created and provided ethics and other education and training programs to firms that cleared their transactions through Paine Webber, and hosted and attended

---

[7]The limitations of using the DOT have been noted by other courts. *See, e.g.*, *Peck*, 495 F. Supp. 2d at 277 ("Generally, the DOT 'groups various jobs into occupation based on their similarities, and thus an occupation in the DOT covers more than one particular job.'" (quoting *Dionida v. Reliance Std. Life Ins. Co.*, 50 F. Supp. 2d 934, 940 n.4 (N.D. Cal. 1999)) (internal quotation marks omitted)).

seminars, SEC/NASD events, and meetings to maintain business relationships with firms. Plaintiff also managed a national marketing support center, and assisted in national advertising and promotional campaigns. All of this required Plaintiff to be mobile and to participate in – and even lead – large meetings, to use a computer and make telephone calls for hours a day, and to coordinate activities, which often required her to carry and move boxes and other materials.

Although Defendants claim they considered Plaintiff's actual duties in reviewing her claim, the record is devoid of any such evidence. In fact, in Reliance's letter to Plaintiff denying her appeal, Defendants expressly stated that they did not consider whether her physical ailments limited her ability to perform her "job," but only determined that she could continue in the sedentary duties of her "occupation." (AR 6.) Defendants further explained, for example, that "[t]raveling in general is essentially considered a sedentary activity." (*Id*.) There is no mention of Plaintiff's other duties, such as organizing and attending seminars or conducting tours. These statements demonstrate that Defendants did not consider Plaintiff's actual duties in defining her regular occupation.

In responding to Plaintiff's motion here, Reliance attempts to justify its choice of "regular occupation" by critically noting that the application for LTD benefits requires the employer to describe Plaintiff's job description, but that this portion was completed by Plaintiff, who provided a "quasi job description."[8] Yet, Reliance fails to indicate if it sought information

---

[8]Reliance is particularly critical of one line (out of many) in Plaintiff's own job description, wherein she mentions, "[d]aily transportation to and from work, subway, taxi and walking." (AR 91.) Defendants argue that commuting is not included as a material duty of Plaintiff's occupation. While that may be true, *see McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 40 (1st Cir. 1998), travel by car, airplane, and subway were material duties of Plaintiff's occupation because she was required to travel to meet clients. In any event, Reliance ignored much more than travel in determining Plaintiff's "regular occupation."

from Plaintiff's employer or if it asked Plaintiff to obtain such information in connection with

her application. Moreover, the Court is aware of no caselaw – and Reliance has cited none –

excusing plan administrators from following *Kinstler*'s requirement that administrators consider

factors such as the nature of the institution where claimant was employed. Indeed, courts have

cited a claimant's own description of job responsibilities in finding that plan administrators had

acted arbitrarily in denying benefits. *See, e.g., Weiss v. Prudential Ins. Co. of Am.*, 497 F. Supp.

2d 606, 613-14 (D.N.J. 2007) (rejecting plan administrator's refusal to consider what

administrator termed the claimant's "self-serving document listing what he claims are his job

duties"); *Peck*, 495 F. Supp. 2d at 278 (quoting plaintiff's description of duties to find that

plaintiff's occupation was "far from sedentary"). It was thus arbitrary and capricious for

Defendants to determine that Plaintiff's regular occupation was an Education Program Director

under the DOT. *See* Weiss, 497 F. Supp. 2d at 612-13 (holding that it was arbitrary for the plan

administrator to look "at the broad category of 'teacher' rather than a more specific descriptive

category of teachers"); *Peck*, 495 F. Supp. 2d at 278 (holding that it was arbitrary for plan

administrator to categorize plaintiff as a general nurse, instead of considering her duties as an

operating room nurse); *Black v. Unum Life Ins. Co. of Am.*, 324 F. Supp. 2d 206, 217-18 (D. Me.

2004) (requiring re-classification of DOT category where plaintiff's actual job duties required

heavier work than category chosen by insurance company).

D. Remand

Having found that Reliance's rejection of Plaintiff's LTD benefits was arbitrary, the next

question is whether it is appropriate to grant Plaintiff's Summary Judgment Motion or to remand

the claim back to the plan administrator.  Plaintiff understandably believes that the Court should

grant her request for benefits without remand, asserting that remand would be futile because

Reliance has demonstrated an unwillingness to give fair consideration to her claim.  As a legal

matter, Plaintiff would not be wrong if the Court found that Reliance had demonstrated an

unwillingness to fairly consider Plaintiff's benefits claim.  *See Miller*, 72 F.3d at 1075

(Calabresi, J., dissenting in part and concurring in part) (noting that "when the trustees have

demonstrated a manifest unwillingness to give fair consideration to evidence that supports the

claimant, the claim should not be returned to the trustees").

　　　At this time, the Court is not prepared to find that Reliance is unwilling or unable to

fairly evaluate Plaintiff's claim for benefits, and Plaintiff points to nothing in the record, other

than Reliance's denial of her claim, that proves otherwise.  Thus, while Plaintiff has made a

persuasive case for benefits, the Court believes it would be inappropriate at this time to grant

Plaintiff's Summary Judgment Motion for two reasons.  First, having found that Reliance

arbitrarily and improperly defined Plaintiff's "regular occupation," it follows that Reliance has

not fully considered whether Plaintiff was disabled from her "regular occupation" as that term

has been defined by the Second Circuit.  *See Peterson v. Continental Cas. Co.*, 77 F. Supp. 2d

420, 429 (S.D.N.Y. 1999) ("[T]his Court is not in a position to grant Plaintiff's cross-motion for

summary judgment that he is entitled, as a matter of law, to the Long-Term disability payments.

This is because Defendant has never considered whether Peterson was disabled from performing

his 'regular occupation' – his job prior to September 1997 . . . ."), *rev'd on other grounds*, 282

F.3d 112 (2d Cir. 2002).  Put simply, the record "is devoid of any analysis by [Reliance] that

would measure [Plaintiff's] disability against" the material duties of the occupation she actually

27

held.  *See id.*; *see also Maida v. Life Ins. Co. of N. Am.*, 949 F. Supp. 1087, 1093 (S.D.N.Y.

1997) ("The fact that [Defendant's] rejection of the claim of mental disability was arbitrary and

capricious does not mean, however, that [Plaintiff's] claim necessarily should have been

granted.").  Thus, remand is appropriate to permit Reliance to evaluate Plaintiff's medical

condition in the proper context of her "regular occupation."  *See Miller*, 72 F.3d at 1072

(remanding claim where administrator's decision was not "based on a consideration of the

relevant factors").

Second, a significant component of Plaintiff's critique of Reliance's conclusion that she

could perform even sedentary work is her Affidavit, which was submitted in connection with the

instant motion, but which was not available to the plan administrator.  For example, to rebut Dr.

Hauptman's finding that Plaintiff's taking of Advil was consistent with his conclusion that her

back injuries were not severe, Plaintiff's Affidavit explains that the Advil was prescribed only

for wrist pain and not for the ailments that were the basis for her disability claim.  While

Plaintiff's Affidavit puts dents in many of Dr. Hauptman's conclusions, it would be

inappropriate for the Court to grant summary judgment for Plaintiff based on information not in

the Administration Record.  *See Maida*, 949 F. Supp. at 1093 ("The Court is in no position to say

that [Defendant], upon the receipt of additional evidence, could not reasonably reject the

claim.").  On remand, however, Defendants can and should consider the statements therein.

So there is no ambiguity, the Court is remanding the LTD benefits claim for a full and

fair hearing by the plan administrator, who should determine Plaintiff's proper regular

occupation in light of her material duties at a national financial institution.  *See Merrill v.*

*Hartford Life & Accident Ins. Co.*, No. 03 CV 1510, 2007 WL 2470005, at *6 (D. Conn. Aug.

28

31, 2007) (remanding case for administrator to "conduct a full and fair review of [plaintiff's] claim in light of this opinion"). The administrator should then determine, based upon the evidence in the record – including Plaintiff's Affidavit submitted in connection with her Summary Judgment Motion – whether Plaintiff is disabled from performing the material duties of her regular occupation. In so doing, the administrator should fully and fairly consider the realistic physical demands associated with those duties and whether Plaintiff can actually perform them given the work restrictions articulated by Plaintiff's treating physicians and Plaintiff's subjective reports of pain.

The Court recognizes that Plaintiff has been without benefits for an extended period of time. Therefore, the Court will retain jurisdiction over this case pending the remand and require that the administrator act expeditiously to resolve Plaintiff's claim. *See Neely v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus.*, No. 00 CV 2013, 2003 WL 21143087, at *12 (E.D.N.Y. Jan. 16, 2003) (retaining jurisdiction pending remand). To that end, Reliance is to reconsider and render its decision within thirty days of receipt of Plaintiff's Affidavit (or any other evidence developed subsequent to the filing of the cross-motions for Summary Judgment). The Parties are directed to report the status of the remand on the 60th and 120th days after the date of this Opinion and Order. All other proceedings before this Court are stayed pending further order of the Court, and the case is placed on the suspense docket. *See Maida*, 949 F. Supp. at 1094-95 (adopting similar procedure).

III.  Conclusion

For the reasons stated herein, Plaintiff's and Defendants' Motions for Summary Judgment are Denied.  The Clerk is directed to terminate the Motions (Doc. # 13 and 16).

SO ORDERED.

Dated:        October 12, 2007
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE